[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
12/28/98
THOMAS K. KAHN
CLERK

No. 95-5258

D. C. Docket No. 93-CV-2053-CIV-ATKINS

ELBA LLAMPALLAS,

Plaintiff-Appellee,

versus

MINI-CIRCUITS, LAB, INC., MINI-CIRCUITS, INC.,  PALMETTO EXTRA
CONDOMINIUM ASSOCIATION, INC.,

Defendants-Appellants.

No. 95-5278

D. C. Docket No. 93-CV-2053-CIV-ATKINS

SILVIA CABRERA,

Plaintiff-Appellant,

versus

MINI-CIRCUITS, LAB, INC.,  PALMETTO EXTRA CONDOMINIUM
ASSOCIATION, INC.,

Defendants-Appellees.

Appeals from the United States District Court
for the Southern District of Florida

**(December 28, 1998)**

Before TJOFLAT and EDMONDSON, Circuit Judges, and O'NEILL*, Senior District Judge.

*Honorable Thomas N. O'Neill, Jr., Senior U.S. District Judge for the Eastern District of
Pennsylvania, sitting by designation.

TJOFLAT, Circuit Judge:

In this case, two lesbian women who had a long-term sexual relationship, Marta Blanch and Elba Llampallas, worked together at the defendant company, Mini-Circuits, Inc. After their sexual relationship ended, Blanch sexually harassed Llampallas, telling Llampallas that if she did not resume the sexual relationship, Blanch would have Llampallas fired. Llampallas did not resume the relationship. Blanch then called the president of Mini-Circuits, Harvey Kaylie, and told Kaylie that she was quitting because she could not work with Llampallas anymore. In response to Blanch's call, Kaylie held a private meeting with Llampallas. Kaylie then suspended and eventually fired Llampallas. Llampallas brought suit against Mini-Circuits under 42 U.S.C. § 2000e et seq. (1994) ("Title VII" or the "Act"), claiming that she was unlawfully terminated "because of" her sex. After a bench trial, the district court held that Mini-Circuits was liable under a theory of strict liability for unlawful quid pro quo sexual harassment.[1]

Mini-Circuits now appeals, arguing that it cannot be held liable to Llampallas under Title VII because Kaylie, not Blanch, fired Llampallas. We hold that Llampallas failed to prove a causal link between the harassment and her discharge sufficient to establish that Mini-Circuits

---

[1] Llampallas brought claims both against Mini-Circuits and against another entity, a non-profit condominium management association, for the loss of her position at Mini-Circuits. She also brought claims against both Mini-Circuits and the condominium association for the loss of her officer-director position at the condominium association. We discuss these claims below, but concentrate in this introduction on what we consider the main issue of the case: whether an employer can be held liable under Title VII for the sexual harassment of its employee by another worker if the harassing worker did not take the "tangible employment action", see Burlington Indus., Inc. v. Ellerth, 524 U.S. –, –, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) (defining a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"), against the employee on which the employee bases her suit.

2

violated Title VII by discriminating against her "because of" her sex. We therefore reverse the judgment of the district court.

I.

In approximately 1977, Elba Llampallas met Marta Blanch in New Jersey and the two women began a consensual sexual relationship. They moved to Florida, bought a house together, and opened a joint bank account out of which they paid all their household expenses. They also gained employment at the same company; Mini-Circuits, Inc., hired Blanch as General Manager of its Hialeah, Florida facility and then hired Llampallas as an assembler at the same plant.[2] Llampallas was eventually promoted to Production Supervisor at Mini-Circuits, a position she held at all times relevant to this litigation. As the Production Supervisor, Llampallas reported to Blanch. Blanch in turn reported to Harvey Kaylie, President of Mini-Circuits, who resided in New York.[3] Kaylie's relationship with Blanch and Llampallas was both professional and social. He visited their home on several occasions and dined with them. Kaylie also transferred title of a company car to Llampallas, hired Llampallas' two sons to work at the Mini-Circuits Hialeah facility, and extended both women "company" loans on very favorable terms.

---

[2] The record does not establish what Llampallas' duties were as an assembler. It appears that assemblers were the lowest-ranking employees at the Hialeah facility.

[3] Kaylie, along with his wife and two daughters, owns more than ninety percent of the stock of Scientific Components Corporation. Mini-Circuits is a wholly-owned subsidiary of Scientific. Scientific is not a party to this suit.

Mini-Circuits consistently awarded both Blanch and Llampallas substantial raises and bonuses for their work at Hialeah. The record reveals no criticism of either woman's performance.

In the fall of 1990, Blanch and Llampallas ended their sexual relationship and Blanch moved out of the house.[4] Blanch then began to threaten Llampallas, telling Llampallas that if Llampallas did not resume their sexual relationship Blanch would have Llampallas fired.[5] These threats occurred on several occasions and were witnessed by several other Mini-Circuits employees.[6]

On May 23, 1991, after a particularly bitter altercation with Llampallas, Blanch called Kaylie in New York. Blanch told Kaylie that she was resigning because she could no longer work with Llampallas. Kaylie told Blanch not to resign. Kaylie then contacted Llampallas and instructed Llampallas to come to New York to meet with him.

Llampallas flew to New York on May 24, 1991, and met with Kaylie for about two hours. The district court made no factual findings regarding the content of that meeting. Both Kaylie and Llampallas testified at trial that they discussed Llampallas' work performance, and

---

[4] In April 1991, Kaylie extended a company loan to Llampallas to enable her to buy Blanch's half of the residence.

[5] The district court found that Blanch had made similar threats before the break-up regarding the consequences for Llampallas if Llampallas ended her relationship with Blanch.

[6] Silvia Cabrera was one of these witnesses. Mini-Circuits later dismissed Cabrera, and she filed suit as Llampallas' co-plaintiff in this action, arguing that Mini-Circuits had unlawfully retaliated against her for being a potential witness to a Title VII violation. Following the bench trial in this case, the district court found that Cabrera had failed to establish a prima facie case of discrimination under Title VII and therefore entered final judgment for Mini-Circuits. Cabrera now appeals. We affirm the district court's judgment under local Eleventh Circuit Rule 36-1. See 11th Cir. R. 36-1.

4

that Kaylie suggested that Llampallas manage a different facility for Mini-Circuits.  Both also testified that at some point during their conversation, Llampallas told Kaylie that she and Blanch were having a "personal problem."[7]

After her meeting with Kaylie in New York, Llampallas returned to Hialeah.  Kaylie then told Llampallas that he was placing her on suspension with full pay.  He informed her that he was contemplating opening another, smaller Mini-Circuits office and told Llampallas that he might transfer her there.  During Llampallas' suspension, Mini-Circuits flew her to New York on several occasions to train her for her new position.  Llampallas also looked for property that Mini-Circuits could buy or lease for the new facility.  On November 8, 1991, however, Kaylie informed Llampallas by letter that there would be no additional Mini-Circuits facility, and that her employment with Mini-Circuits had been terminated.

On January 22, 1992, Llampallas received another letter, signed by Blanch and on Mini-Circuits' stationery, removing Llampallas from her position as Vice President and member of the Board of Palmetto Extra Condominium Association, Inc., a co-defendant in this action.  Palmetto is a non-profit corporation formed to operate, manage, and administer a commercial condominium with seven units in Hialeah, Florida.  Membership in Palmetto is predicated on ownership of a condominium unit; each unit owner is a member and receives one vote in all membership decisions.  Six of the seven units in the condominium that Palmetto manages are

---

[7] Llampallas testified that she believed Kaylie knew she and Blanch were lovers because Kaylie had visited their home on several occasions and must have seen that she and Blanch shared a bedroom.  Kaylie denied knowing that Blanch and Llampallas were homosexual, let alone that they were involved in a sexual relationship with each other, until Llampallas filed sexual discrimination charges with the Equal Employment Opportunity Commission based on Blanch's harassment.

5

owned by Scientific Components Corporation, Mini-Circuits' parent company. See supra note 3. Scientific leases these six units to Mini-Circuits for its operations. The seventh unit is owned by Irest Corporation, an entity not named as a defendant in this suit.[8]

In accordance with Palmetto's Articles of Incorporation and by-laws, Palmetto is run by a board of three Directors elected by the corporation's members. The Board oversees the corporation and appoints officers (President, Vice President, Secretary, and Treasurer) to conduct the corporation's day-to-day business. When Palmetto was first incorporated, the Board of Directors consisted of three of the condominium's developers; the developers also filled all officer positions. When the developers released the condominium to the unit owners, the owners nominated and elected Llampallas, Blanch, and Kaylie as the new Board. Llampallas, Blanch, and Kaylie then appointed themselves to fill all officer positions for Palmetto – Llampallas served as Vice President. On December 12, 1991, Kaylie and Blanch met as a quorum of the Palmetto Board (Llampallas was absent) and voted to remove Llampallas both from the Board and from her position as Vice President of the association.

After Llampallas received the letters from Palmetto and Mini-Circuits terminating her positions with those companies, she attempted to find other work. Llampallas was unable to obtain comparable or even permanent employment anywhere else.

On October 19, 1993, Llampallas brought suit against both Mini-Circuits and Palmetto in the Southern District of Florida under Title VII. She alleged that Blanch had conducted a campaign of "quid pro quo sexual harassment" against her and that Mini-Circuits and Palmetto were strictly liable for that harassment. Llampallas claimed that the harassment resulted in the

---

[8] Irest has no connection to Scientific or to Mini-Circuits.

loss of both her position as Production Supervisor at Mini-Circuits and her position as officer-director at Palmetto. She sought relief in the form of back pay, reinstatement, compensatory and punitive damages, attorneys' fees, and costs.

Following a bench trial, the district court found that Blanch had engaged in "quid pro quo harassment" of Llampallas. It also found that Mini-Circuits' proffered reason for Llampallas' discharge was wholly non-credible.[9] The court concluded that Mini-Circuits was "strictly liable for Blanch's harassment" because Blanch had forced Mini-Circuits to discharge Llampallas by threatening to quit herself. The court also found that "Palmetto's discharge of Llampallas from her Board position and officer duties was a direct result of Llampallas' discharge from Mini-Circuits"; thus, the court decided, Llampallas was also entitled to recovery under Title VII for the loss of her officer-director position at Palmetto. The court then held that both Palmetto and Mini-Circuits were jointly liable for Llampallas' loss of both her position at Mini-Circuits and her positions at Palmetto because the two entities were a "single employer" under Title VII.

Because it determined that the parties had inadequately briefed the issue of damages, the court requested supplemental memoranda of law on the issue. After considering the memoranda, the court awarded Llampallas back pay and front pay totaling $1,736,256.48.

Mini-Circuits and Palmetto now appeal. Their arguments and our holdings are as follows.

(1) Both Mini-Circuits and Palmetto claim that they cannot be held liable to Llampallas for the loss of her position as officer-director of Palmetto because she was not an "employee" in

---

[9] Mini-Circuits claimed that Llampallas was fired because she failed to implement the company's new management philosophy.

that position. We agree. We therefore vacate the portion of the district court's judgment based on the loss of her director-officer position.

(2) Palmetto claims that it is not subject to suit under Title VII because it is not an "employer" under the statute. We agree. We therefore vacate the portion of the district court's judgment assessing liability against Palmetto and remand with directions to dismiss Palmetto from this suit.

(3) Both Mini-Circuits and Palmetto claim that the district court erred in holding them strictly liable based on Blanch's harassment of Llampallas because Blanch did not use her actual or apparent authority to take an adverse employment action against Llampallas. We hold that Llampallas failed to prove that she was discriminated against "because of" her sex in violation of Title VII because she did not establish a causal link between Blanch's harassment and Kaylie's employment decisions. We therefore reverse the portion of the district court's judgment that is based on Llampallas' loss of her position as Production Supervisor, and direct the court to enter judgment for Mini-Circuits on remand.[10]

II.

---

[10] Both Mini-Circuits and Palmetto also argued in their brief on appeal and at oral argument that same-sex quid pro quo harassment is not cognizable under Title VII. We delayed our decision in this case to await the Supreme Court's decision in Oncale v. Sundowner Offshore Services, Inc., 523 U.S. –, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), addressing the same issue. The Oncale Court held that same-sex harassment is cognizable under Title VII; thus, we dispose of this initial argument by reference to that opinion and to our own opinion in Fredette v. BVP Management Associates, 112 F.3d 1503 (11th Cir. 1997), cert. denied, – U.S. –, 118 S.Ct 1184, – L.Ed.2d – (1998). See also infra part II.C. (explaining that same-sex sexual harassment can give rise to the same inference of impermissible discriminatory animus as does different-sex sexual harassment, depending on the sexual preference of the harasser).

In part II.C, we conclude that Llampallas cannot succeed on the merits of any Title VII claim because she failed to prove that she suffered discrimination "because of" her sex. Thus, if the first two claims presented – that Palmetto was not an "employer" and that Llampallas was not an "employee" – bear on the merits of the case as well, we need not spend time assessing those claims. In McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 931-32 (11th Cir. 1987), however, we implied that the issue of who is an "employer" (and, concomitantly, the issue of who is an "employee") under Title VII bears on subject matter jurisdiction. See also Lyes v. City of Riviera Beach, 126 F.3d 1380, 1384 (11th Cir. 1997), reh'g granted & op. vacated, 136 F.3d 1295 (1998) ("The existence of a Title VII 'employer' is a jurisdictional prerequisite to suit under the statute." (citing Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1359 (11th Cir. 1994) (citing McKenzie))); Rogero v. Noone, 704 F.2d 518, 520 (11th Cir. 1983) (referring to the "jurisdictional requirement of numerosity" included as part of the definition of "employer" under the statute). Although we question whether this implication is correct under Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed.2d 939 (1946) (explaining the difference between a challenge brought on jurisdictional grounds and a challenge brought on the merits for failure to state a claim); see also Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1261-66 (11th Cir. 1997) (discussing the definition of "employer" and "employee" under the Age Discrimination in Employment Act ("ADEA") as both a jurisdictional issue and an issue bearing on the merits of the case), we believe McKenzie is binding precedent. We therefore treat both definitional claims as jurisdictional ones and address them before reaching the merits of the case. In part II.A, we assess the appellants' claim that Llampallas was not an "employee" in her position as officer-

9

director at Palmetto. In part II.B, we assess the appellants' claim that Palmetto was not an "employer" under Title VII.

A.

Title VII prohibits discrimination against "any individual" with regard to that individual's terms and conditions of employment or application for employment. See 42 U.S.C. § 2000e-2(a) (1994). The statute does not define "any individual," and although we could read the term literally, we have held that only those plaintiffs who are "employees" may bring a Title VII suit. See McClure v. Salvation Army, 460 F.2d 553, 556 (5th Cir. 1972) (stating that "[i]f the provisions of Title VII are to apply to the relationship between [the defendant] and [the plaintiff,] it is necessary that [the defendant] be an 'employer' engaged in an 'industry affecting commerce' and that [the plaintiff] be an 'employee' as those terms are defined" in the Act);[11] Serapion v. Martinez, 119 F.3d 982, 985 (1st Cir. 1997) ("Although the language [of Title VII] speaks of 'any individual,' courts long ago concluded that Title VII is directed at, and only protects, employees and potential employees."); Alexander v. Rush N. Shore Med. Ctr., 101 F.3d 487, 491 (7th Cir. 1996), cert. denied, – U.S. –, 118 S.Ct. 54, 139 L.Ed.2d 19 (1997) (overruling previous case refusing to "restrict[] the Act's protection to only former, present, and potential employees"); Hyland v. New Haven Radiology Assocs., 794 F.2d 793, 796 (2d Cir. 1986) (interpreting identical "any individual" language in the ADEA) to provide coverage "solely in favor of a person who is an employee"); but see Sibley Mem. Hosp. v. Wilson, 488 F.2d 1338, 1341

---

[11] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

10

(D.C.Cir. 1973) ("any individual" not limited to "employees"); but cf. Gomez v. Alexian Bros. Hosp. of San Jose, 698 F.2d 1019, 1021 (9th Cir. 1983) (recognizing suit for discriminatory failure to hire when the defendant employer failed to hire another corporation as an independent contractor and a potential employee of the rejected corporation brought suit directly against the defendant employer).

This limitation is necessary to further Congress' intent in enacting Title VII. "Title VII does not presume to obliterate all manner of inequity." Keyes v. Secretary of the Navy, 853 F.2d 1016, 1026 (1st Cir. 1988). Instead, Congress intended to limit the scope of the Act to specific employment relationships; thus, the statute provides relief only against "employers" as defined under the statute. We can assume that Congress also meant to limit the pool of potential plaintiffs under Title VII; otherwise, any person could sue an "employer" under the statute regardless of whether she actually had an employment relationship with that employer. Hence, courts have almost universally held that the scope of the term "any individual" is limited to employees.

Title VII's remedial scheme also supports this interpretation; the statute authorizes remedies such as reinstatement, hiring, and back pay that could not make a non-employee plaintiff whole. Moreover, in 1972, Congress extended the reach of Title VII to the federal workplace, amending the Act to cover "all personnel actions affecting employees or applicants for employment . . . ." Pub. L. No. 92-261, § 717, 86 Stat. 103, 111 (1972) (codified at 42 U.S.C. § 2000e-16(a) (1994)) (emphasis added). Because Congress intended, by this amendment, to make Title VII applicable in the federal workplace to the same extent that it was already applicable in the non-federal workplace, see H.R. Rep. No. 92-238 (1971), reprinted in 1972 U.S.C.C.A.N.

11

2137, 2159-60, the amendment supports the interpretation of "any individual" in the original Act as limited to those individuals who are employees.

Title VII includes a definition of the term "employee": "an individual employed by an employer." See 42 U.S.C. § 2000e(f) (1994).[12] This definition does not get us very far. We believe, however, that only individuals who receive compensation from an employer can be deemed "employees" under the statute. See O'Connor v. Davis, 126 F.3d 112, 115-16 (2nd Cir. 1997), cert. denied, – U.S. –, 118 S.Ct. 1048, 140 L.Ed.2d 112 (1998) ("Where no financial benefit is obtained by the purported employee from the employer, no plausible employment relationship of any sort can be said to exist because . . . compensation . . . is an essential condition to the existence of an employer-employee relationship." (internal quotations and citations omitted)); see also Haavistola v. Community Fire Co., 6 F.3d 211, 221-22 (4th Cir. 1993) (reversing a grant of summary judgment for employer because question of whether benefits provided to plaintiff were sufficient "compensation" to render plaintiff an employee was one of disputed fact); cf. McClure, 460 F.2d at 557 (holding that an individual who was "selected, employed, controlled, trained, and paid" by the employer was an employee (emphasis added)). Congress did not intend Title VII to protect mere titles or labels; an individual who sues only to maintain a purely gratuitous working relationship does so without the protection of that statute. Thus, because the record establishes that Llampallas received no compensation as an officer-

---

[12] This definition is included to define the term "employer" under the statute. Title VII limits those who can be sued under the statute to "employers." See infra part II.B. An "employer" is defined as "a person . . . who has fifteen or more employees." 42 U.S.C. § 2000e(b) (1994). Thus, section 2000e(f) might not bear upon the definition of employee for purposes of determining who is an "individual" who can sue under the statute. Because the statutory definition of "employee" really provides no guidance to interpreting the term, however, this concern does not affect our analysis.

12

director of Palmetto,[13] she cannot be considered an "employee" of Palmetto for Title VII jurisdictional purposes.[14]

In sum, the district court had no jurisdiction to assess the merits of Llampallas' Title VII claim to the extent it was based on the loss of her position as officer-director of Palmetto. We therefore vacate the portion of the district court's judgment addressing that loss.

B.

Although Title VII does not on its face define who can sue under the statute, it does clearly define who can be sued. A plaintiff may bring a Title VII action against any "employer," defined as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . ." 42 U.S.C. § 2000e(b). It is undisputed that Palmetto does not employ fifteen employees. Llampallas, however, argued at trial that Mini-Circuits and Palmetto should be considered as a "single employer" under Title VII such that the employees of both companies count toward the fifteen-employee jurisdictional requirement. The district court agreed, applying

---

[13] Because the designation of a plaintiff as an employee "must turn on the facts of a particular case," Fountain v. Metcalf, Zima & Co., P.A., 925 F.2d 1398, 1400 (11th Cir. 1991) (distinguishing a partner in an accounting firm from an employee under the ADEA) (citation omitted), and because the district court made no findings pertaining to Llampallas' status as an employee, we must peruse the record ourselves.

[14] Llampallas received no salary or wages for her position. She did introduce into evidence a check for $1,000.00, issued by Palmetto, that reads "directory's [sic] fee," which she claims establishes she was paid for her services at Palmetto. We note that the phrase "directory's fee" is written in a different hand than the rest of the check. We also note that under Palmetto's by-laws, "[n]o compensation shall be paid to Directors or Officers for their services as Directors or Officers," and that Llampallas reported the $1,000.00 as "nonemployee compensation" for income tax purposes. In light of this information, we find that the $1,000.00 was not compensation sufficient to establish employee status.

13

the four-part test developed in <u>Radio and Television Broadcast Technicians Local Union 1264 v.</u> <u>Broadcast Service of Mobile, Inc.</u>, 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) (holding that two entities were a single employer and therefore that their gross receipts could be totaled together to establish jurisdiction under the National Labor Relations Act), to hold that Mini-Circuits and Palmetto were a "single integrated enterprise" so that the two entities could be considered one employer for jurisdictional purposes. Because Palmetto and Mini-Circuits together employ more than fifteen employees, the court then held Palmetto jointly liable with Mini-Circuits for the loss of both Llampallas' position at Mini-Circuits and her position at Palmetto. We review the district court's decision to hold Palmetto liable under Title VII <u>de novo</u>. Because we have already determined that neither entity can be held liable for the loss of Llampallas' position as officer-director of Palmetto, <u>see</u> <u>supra</u> part II.A., we confine our discussion to Palmetto's responsibility for Llampallas' loss of her position at Mini-Circuits.

Regardless of whether we address Palmetto's status under the "single employer" theory of jurisdiction, <u>see</u> <u>McKenzie</u>, 834 F.2d at 933 n.3 (adopting the <u>Radio and Television</u> test for Title VII purposes), or a "joint employer" theory of liability, <u>see</u> <u>Virgo v. Riviera Beach Assocs., Ltd.</u>, 30 F.3d 1350, 1359-61 (11th Cir. 1994), Palmetto cannot be held liable under Title VII for firing Llampallas from her position as Production Supervisor at Mini-Circuits. Both theories concentrate on the degree of control an entity has over the adverse employment decision on which the Title VII suit is based. <u>See</u>, <u>e.g.</u>, <u>Fike v. Gold Kist, Inc.</u>, 514 F.Supp. 722, 725-26 (N.D. Ala. 1981), <u>aff'd</u> 664 F.2d 295 (11th Cir. 1982) (single employer); <u>Swallows v. Barnes & Noble Book</u> <u>Stores, Inc.</u>, 128 F.3d 990, 993 n.4 (6th Cir. 1997) (explaining the differences between the joint employer theory and the single employer theory); <u>Schweitzer v. Advanced Telemarketing Corp.</u>,

14

104 F.3d 761, 763-64 (5th Cir. 1997) (single employer); Cook v. Arrowsmith Shelburne, Inc., 69

F.3d 1235, 1241 (2d Cir. 1995) (single employer). In this case, that adverse employment decision

was Llampallas' termination from her position as Production Supervisor at Mini-Circuits, and

Palmetto had absolutely nothing to do with that decision. Palmetto had no interaction with Mini-

Circuits employees. It made no decisions that affected the terms and conditions of employment at

Mini-Circuits. In fact, it was completely uninvolved in the operation of Mini-Circuits.[15] We

therefore vacate the portion of the district court's judgment holding Palmetto responsible for the

loss of Llampallas' position at Mini-Circuits and remand with directions that the district court

dismiss Palmetto from this suit for lack of jurisdiction.

---

[15] The district court did make a finding that Palmetto and Mini-Circuits were operated "for a common business purpose, i.e., the manufacture and sale of electrical assemblies." This finding goes to the "interrelationship of operations" prong of the McKenzie test for "single employers."

After examining the record, however, we hold that this finding is clearly erroneous. It is undisputed that Mini-Circuits, a member of Palmetto, manufactured and sold electrical assemblies; there is no support, however, for a finding that Palmetto manufactured or sold electrical assemblies. Palmetto's by-laws state that the corporation was "organized for the purpose of being a condominium association . . . and in turn for the purpose of operating, governing, administering and managing the property and affairs of PALMETTO EXTRA, a commercial condominium . . . ." There is nothing in the record to suggest that Palmetto was operated in violation of its by-laws, or that Palmetto was operated as anything but a non-profit association of condominium owners.

The district court apparently reasoned that because Mini-Circuits was a member of Palmetto and rented space in the Palmetto-managed condominium, Palmetto itself furthered the business of Mini-Circuits, whatever that business may have been. An association, however, does not engage in the business of its member corporations simply because those member corporations belong to the association. (Even if the law were otherwise, the district court would have had to find that Palmetto was operated for the business purposes of all of its members, including Irest Corporation. The district court made no findings concerning Irest.) To conclude otherwise would render every association, whether a management, trade, or professional association, liable for the conduct of every one of its members simply by virtue of their association.

C.

The only claim over which the district court had jurisdiction, therefore, was Llampallas'

claim against Mini-Circuits for the loss of her position as Production Supervisor. We now

address the merits of this claim.

The district court concluded that Mini-Circuits was liable to Llampallas under 42 U.S.C. §

2000e-2(a)(1) (1994), which states:

> It shall be an unlawful employment practice for an employer to fail or refuse to
> hire or to discharge any individual, or otherwise to discriminate against any
> individual with respect to his compensation, terms, conditions, or privileges of
> employment, because of such individual's race, color, religion, sex, or national
> origin . . . .

To succeed in proving intentional discrimination under this section, therefore, a plaintiff must

establish, by a preponderance of the evidence: (1) a discriminatory animus towards him (i.e., an

attitude towards the plaintiff held because of one of the listed characteristics), see International

Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d

396 (1977) (stating that in disparate treatment cases, "[p]roof of discriminatory motive is critical,

although it can in some situations be inferred from the mere fact of differences in treatment"),[16]

(2) an alteration in the terms and conditions of his employment by the employer, and (3) a causal

link between the two. Cf. Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)

(establishing the elements for a prima facie case under §2000e-3(a) (1994), which prohibits

adverse employment action because of the plaintiff's conduct instead of adverse employment

action because of the plaintiff's characteristics). We interpret the claim of error before us as an

_____

[16] In this opinion we address only "disparate treatment" claims, as opposed to "disparate
impact" claims.

16

assertion that the district court erred in holding Mini-Circuits liable for violating this section because Llampallas failed to prove the third element of her claim.[17]  In other words, assuming that the district court was correct in finding that Blanch harbored a discriminatory animus towards Llampallas, and that Mini-Circuits terminated Llampallas' employment, Mini-Circuits argues that Llampallas failed to establish a causal link between the two events.  We agree.

It is an extraordinary case in which a defendant employer admits it has taken an adverse employment action against a plaintiff employee "because of" the employee's sex.[18]  Thus, courts must rely on inferences drawn from the observable facts to determine whether a Title VII violation has occurred.  If an employee of the defendant has "sexually harassed" the plaintiff, and the harassing employee then takes a "tangible employment action" against the plaintiff, the plaintiff may take advantage of a chain of inferences to establish, based on those facts alone, all three elements of her Title VII claim.

---

[17]  Mini-Circuits argues that the district court "should either have concluded that no quid pro quo harassment was proven here, or that the rule of strict liability, applied in more typical quid pro quo cases did not apply."  The Supreme Court, however, recently made clear that "the labels quid pro quo and hostile work environment are not controlling for purposes of establishing employer liability."  Burlington Indus., 524 U.S. at –, 118 S.Ct. at 2271.  In this case, Mini-Circuits' use of the term "quid pro quo" only causes confusion, because Mini-Circuits attempts to use the term to invoke rules developed in earlier cases that do not apply to the unique set of facts surrounding Llampallas' situation.  We therefore disregard the parties' labels and proceed from the statute itself.

[18]  We do not address Title VII claims based on an alleged alteration in the terms and conditions of the plaintiff's employment that does not rise to the level of a "tangible employment action" because Llampallas brought her complaint based solely upon Mini-Circuits termination of her employment, the classic and ultimate "tangible employment action."  Even if Llampallas had alleged the existence of an "abusive working environment" as the necessary alteration, see infra note 23, we believe that the actions of Mini-Circuits and of Llampallas would be sufficient to afford Mini-Circuits an affirmative defense to liability under Title VII.  See infra note 28.

17

First, in such a situation, the act of sexual harassment itself creates an inference that the harasser harbors a sexually discriminatory animus towards the plaintiff. When a person "sexually harasses" another, i.e., makes comments or advances of an erotic or sexual nature, we infer that "the harasser [is making] advances towards the victim because the victim is a member of the gender the harasser prefers." Fredette v. BVP Management Assocs., 112 F.3d 1503, 1505 (11th Cir. 1997), cert. denied, – U.S. –, 118 S.Ct 1184, – L.Ed.2d – (1998). Unless there is evidence to the contrary, therefore, we also infer that the harasser treats members of the "non-preffered" gender differently – and thus that the harasser harbors an impermissible discriminatory animus towards persons of the preferred gender. See Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982) ("In the typical case in which a male supervisor makes sexual overtures to a female worker, it is obvious that the supervisor did not treat male employees in a similar fashion."). This inference can be drawn regardless of the sexual orientation of the harasser, so long as the harassed victim is of the harasser's "preferred" gender. As the Supreme Court explained in Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. –, –, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998),

> Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual.

Second, a tangible employment action – e.g., demotion or discharge, see Burlington Indus., Inc. v. Ellerth, 524 U.S. –, –, 118 S.Ct. 2257, 2268, 141 L.Ed.2d 633 (1998) – is clearly an alteration in the terms and conditions of the plaintiff's employment.[19] Moreover, that action will

---

[19] Occasionally, a court implies that sexually harassing conduct itself violates Title VII. Sexually demeaning behavior, however, is merely evidence of a discriminatory animus, and Title

18

be imputed to the employer. Because an employee who is able to take such an action necessarily "has been empowered by the company as a distinct class of agent" to make that decision, and because the decision is "the means by which [the agent employee][20] brings the official power of the [employer] to bear" on the plaintiff, "a tangible employment action taken by the [employee] becomes for Title VII purposes the act of the employer." Burlington Indus., 524 U.S. at –, 118 S.Ct. at 2269. Thus, the plaintiff has satisfied the second element of her case: an alteration in the terms and conditions of her employment by the employer.

---

VII does not punish the existence of a discriminatory animus. It is only when that animus causes an alteration in the terms and conditions of the plaintiff's employment that the employer will be held liable to the plaintiff under the statute. A Title VII plaintiff may establish such an alteration by showing either 1) a tangible employment action, which "itself constitutes a change in the terms and conditions of employment," see Burlington Indus., 524 U.S. at –, 118 S.Ct. at 2265, or 2) the existence of an "abusive working environment," which courts recognize as synonymous with a "constructive" alteration in the terms and conditions of the plaintiff's employment. See Burlington Indus., 524 U.S. at –, 118 S.Ct. at 2264; Faragher v. City of Boca Raton, 524 U.S. –, –, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998).

[20] We have replaced the Supreme Court's term "supervisor" with the broader term "employee." The label placed on the employee who takes a tangible employment action against the plaintiff is irrelevant because it is the employee's ability to take the action that identifies the employee as the employer's "agent" and imputes liability to the employer under Title VII. To take an adverse employment action of the type that triggers Title VII, an employee must be the employer's agent. Although the employer may argue that the employee had no actual authority to take the employment action against the plaintiff, apparent authority serves just as well to impute liability to the employer for the employee's action. See Gay v. Board of Trustees of San Jacinto College, 608 F.2d 127, 128 (5th Cir. 1979) (rejecting a defense of no authority because the employer "held out the supervisor as a person having authority over those under his supervision, and the plaintiff perceived him to have authority to discharge her"). The term "supervisor," therefore, is rather superfluous when the plaintiff brings suit based on a tangible employment action. If an employee takes a tangible employment action against the plaintiff, the employer will held liable under Title VII for that action (if the action otherwise violates the statute), regardless of whether the employee taking the action is labeled the plaintiff's "supervisor."

19

Third, the fact that the harasser was the decisionmaker for the tangible employment action gives rise to an inference that the harasser's discriminatory animus motivated that action. We assume that the harasser, because she harbors a discriminatory animus towards the plaintiff, could not act as an objective, non-discriminatory decisionmaker with respect to the plaintiff. Thus, any time the harasser makes a tangible employment decision that adversely affects the plaintiff, an inference arises that there is a causal link between the harasser's discriminatory animus and the employment decision. A Title VII plaintiff, therefore, may establish her entire case simply by showing that she was sexually harassed by a fellow employee, and that the harasser took a tangible employment action against her.

In this case, the district court found that Blanch and Llampallas were both lesbians, and that Blanch sexually harassed Llampallas. Because nothing in the record suggests that Blanch sexually harassed anyone other than Llampallas, therefore, we infer a discriminatory animus by Blanch towards Llampallas based on Llampallas' sex. We also know that a tangible employment action was taken against Llampallas – termination of her employment by Mini-Circuits. Thus, we assume that if that action was taken "because of" Llampallas' sex, Mini-Circuits will be held liable. Blanch, however, did not herself make the decision to terminate Llampallas' employment; Kaylie did.[21] Although this fact is not fatal to Llampallas' claim, see e.g., Sparks v. Pilot Freight Carriers, Inc., 830 F.2d 1554, 1565 (11th Cir. 1987) (reversing district court's grant of summary judgment for the employer because an issue of material fact remained as to whether the alleged

---

[21] Indeed, the district court made no findings regarding Blanch's authority to fire Llampallas. The record, however, reflects that Kaylie first asked Blanch to fire Llampallas, which she refused to do. We assume, therefore, that Blanch had the authority to fire Llampallas herself. This assumption does not affect the outcome of this case.

20

harasser "influenced" the decisionmaker to fire the plaintiff ), she cannot benefit from the inference of causation arising from the common identity of a harasser and a decisionmaker. Instead, Llampallas had the burden to prove at trial that Blanch's discriminatory animus caused Kaylie to terminate her employment with Mini-Circuits. We believe that she failed to do so.

The district court found that Llampallas had established causation, stating that Mini-Circuits could be held liable for Blanch's harassment because "Blanch made good on her threat [to fire Llampallas] and got Llampallas fired." The court's own findings, however, belie a determination that the causal link lay between Blanch's sexually discriminatory animus towards Llampallas and Llampallas' discharge.

The court made the following factual findings concerning Blanch's role in Llampallas' discharge:

> On May 23, 1991, Blanch called Kaylie in New York and informed him that she was resigning because she could no longer work with Llampallas. Kaylie told her not to do that. He immediately told Llampallas to come to New York to see him.
> Llampallas went to New York around May 24, 1991, to meet with Kaylie. After the meeting, Kaylie placed Llampallas on suspension, effective May 27, 1991, for six to eight weeks at her full pay . . . .
> . . .
> On November 8, 1991, Kaylie informed Llampallas that he was not going to open the new facility [which she was to manage] and that he was terminating her from her employment with Mini-Circuits.

Record, vol. 4, n. 124, at paras. 24-25 & 27 (ord.). The court then explained its reasoning behind its finding that Blanch "got Llampallas fired":

> Due to the fact that Blanch could not work with Llampallas once they were no longer lovers, Blanch telephoned Kaylie in May of 1991 telling him she was quitting because of Llampallas. This, in effect, forced Kaylie to choose between the two women. He put Llampallas on suspension while he tried to find another facility for Llampallas (although her work performance was allegedly declining) and once that fell through, he had no choice but to terminate Llampallas.

21

Record, vol. 4, n. 124, at para. 48.

The district court found, therefore, that when Kaylie terminated Llampallas' employment, he did so because he wished to retain Blanch. Title VII does not prohibit an employer from discharging an employee because it wishes to retain another, presumably more valuable, employee – unless, of course, the desired employee is of a different sex from the plaintiff, and the decision can be linked to a discriminatory animus towards persons of the non-desired employee's sex. Here, Llampallas and Blanch are both women; thus, the fact that Kaylie chose Blanch over Llampallas cannot give rise to an ultimate inference that Kaylie choose Blanch "because of" Llampallas' sex. The district court's findings, therefore, do not support its conclusion that because Blanch "got Llampallas fired," Mini-Circuits can be held liable for Llampallas' discharge under Title VII.[22] We look to the record to determine whether there is any evidence to support an inference of a causal link between Blanch's discriminatory animus and the decision to terminate Llampallas' employment. If not, we must disregard the court's ultimate finding of intentional discrimination based on that inference as clearly erroneous.

Several courts have held that even when the harasser in a Title VII case is not the decisionmaker, if the plaintiff shows that the harasser employed the decisionmaker as her "cat's

---

[22] We recognize that Mini-Circuits also claimed at trial that it had discharged Llampallas for legitimate nondiscriminatory reasons unrelated to its desire to retain Blanch as an employee. The district court specifically found that these other reasons were wholly non-credible. That finding, however, does not translate into a finding that Mini-Circuits fired Llampallas "because of" her sex.

As mentioned supra, the district court apparently found that Mini-Circuits' "true reason" for firing Llampallas was its desire to retain Blanch. This is a legitimate, nondiscriminatory reason. Moreover, we conclude that Mini-Circuits' reasonable attempt to investigate the circumstances surrounding Blanch's threat, see discussion infra, negates any inference of discrimination that could be drawn from Mini-Circuits' false proffer.

paw" – i.e., the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation, see Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990) – causation is established. See, e.g., Long v. Eastfield College, 88 F.3d 300, 307 (5th Cir. 1996) ("If . . . [the decisionmaker] did not conduct his own independent investigation, and instead merely 'rubber stamped' the recommendations of [those who held a discriminatory animus], the causal link between [the plaintiffs'] protected activities and their subsequent termination, would remain intact."). In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers. See Shager, 913 F.2d at 405 (stating that in such a situation "[t]he [decisionmaker] would no more be a nonconductor [for discriminatory animus] . . . than would be the secretary who typed [the plaintiff's] discharge papers knowing nothing of the [] discrimination that lay behind the discharge"); Burlington Indus., 524 U.S. at –, 118 S.Ct. at 2269. In effect, the harasser is the decisionmaker, and the titular "decisionmaker" is a mere conduit for the harasser's discriminatory animus.

This, however, is not a cat's paw case. Kaylie's decision to suspend and discharge Llampallas was not simply a tacit approval of Blanch's own decision to do the same. Blanch communicated no adverse employment decision regarding Llampallas to Kaylie for his review; nor did she recommend that Kaylie take action against Llampallas. The only "decision" Blanch made was to quit Mini-Circuits because she "couldn't work with [Llampallas] anymore." We recognize that Blanch's threat to quit was probably part of a scheme to manipulate the company into firing Llampallas because of her sex – Blanch made a "fake" threat knowing that Kaylie would choose her over Llampallas. We do not, however, need to decide whether Mini-Circuits

23

could be held liable based on Kaylie's unwitting compliance in Blanch's manipulative plan, because such is not the case before us.

When Kaylie received Blanch's phone call, he did not take action against Llampallas based on that threat. Instead, he summoned Llampallas to New York to investigate the situation. Kaylie afforded Llampallas a private audience of several hours, and gave her the opportunity to explain the situation at Hialeah. During that conversation, Llampallas informed Kaylie neither of her sexual relationship with Blanch, nor of the developments upon the demise of that relationship. According to both Llampallas' and Kaylie's testimony, the conversation revolved around Llampallas' work habits and whether Llampallas would be able to run a new Mini-Circuits office away from Blanch. This meeting suffices to except this case from the cat's paw line of cases. See Willis v. Marion County Auditor's Office, 118 F.3d 542, 547 (7th Cir. 1997) (excepting from the "cat's paw" line a case in which the decisionmaker investigated a subordinate's motives by meeting with the plaintiff before acting on the subordinate's adverse recommendations).

Moreover, we believe that the behavior of both Kaylie and Llampallas during their meeting negates any remaining inference of causation between Blanch's discriminatory animus and Kaylie's termination of Llampallas' employment. The Supreme Court recently declared that an employer's Title VII liability for its employees' actions is circumscribed not only by agency principles, but by the employer's own efforts to prevent Title VII violations in its workplace and swiftly to remedy such violations if they do take place. See Burlington Indus., 524 U.S. at –, 118 S.Ct. at 2270. If those efforts are reasonable – i.e., if the employer behaved reasonably in attempting to ferret out and eliminate sexual harassment among its employees that could lead to adverse employment consequences for the harasser's victims – the Court declared, a reviewing

24

court should take those efforts into consideration when assessing the employer's liability stemming from any undiscovered harassment. See id. at –, 118 S.Ct. at 2270-71. Further, the Court stated that the avoidable consequences doctrine applied in tort law to limit a defendant's liability is applicable to Title VII. See id. at –, 118 S.Ct. at 2270.[23]

Applying these principles to Llampallas' case, we believe that Mini-Circuits, through Kaylie, "broke the chain" of causation between Blanch's harassment and its decision to terminate Llampallas' employment both because it behaved reasonably in response to Blanch's threat to quit, and because Llampallas herself failed to avoid the consequences of that threat. When Kaylie called Llampallas to New York he did not know, nor could any reasonable person know, that Blanch's threat was motivated by a discriminatory animus towards Llampallas. Thus, Kaylie was not "on notice" that Blanch could be scheming against Llampallas based on Llampallas' sex. Llampallas, although she had the opportunity to do so, failed to inform Kaylie of her relationship

---

[23] We note that the Court in Burlington Industries applied these principles to formulate an "affirmative defense" available to an employer who is sued under Title VII in certain circumstances. The Court specifically stated that "[n]o affirmative defense is available, however, when [a] supervisor's harassment culminates in a tangible employment action, such as discharge, demotion or undesirable reassignment." See Burlington Indus., 524 U.S. at –, 118 S.Ct. at 2270. We conclude that this dicta does not prevent us from considering Mini-Circuits' and Llampallas' actions following Blanch's threat for two reasons. First, although the Court's use of the term "culminates" may appear to draw within the ambit of the exception all those situations in which the harasser's sexually discriminatory animus is a "but for" cause of the tangible employment action, we believe that the Court meant to limit the exception to those cases in which the harasser acts as the decisionmaker with respect to the action, either in actuality or by using another as a "cat's paw." See id. at –, 118 S.Ct at 2269-71. Thus, the exception does not apply to cases such as Llampallas' in which the harasser is not the decisionmaker. Second, in this case, we are not considering the actions of Mini-Circuits and Llampallas as part of a possible "affirmative defense" applied after we have determined that Llampallas proved a Title VII violation. Instead, we are applying the Burlington Industries Court's articulated policies to determine whether Llampallas even established an element of her case.

25

with Blanch and of the information she possessed that would have put Kaylie on notice that Blanch's threat may have been motivated by a discriminatory animus.

We hesitate to require an employer to investigate – as Mini-Circuits did – every action of its employees that could be motivated by a discriminatory animus. When the employer makes an effort to determine the employee's side of the story before making a tangible employment decision affecting that employee, however, it should not be held liable under Title VII for that decision based only on its employee's hidden discriminatory motives.[24] In this case, Mini-Circuits should not be held liable for discharging Llampallas simply because Blanch harbored a discriminatory animus towards Llampallas. We hold, therefore, that Llampallas failed to provide evidence sufficient to create an inference of causation between Blanch's sexually discriminatory

---

[24] Upon examination of the record, we note that Llampallas testified at trial that during her meeting with Kaylie that she told Kaylie the problem between herself and Blanch was "personal," and that Kaylie did not respond to this statement. Further, in a letter that Llampallas wrote to Kaylie following their meeting, and during her suspension, Llampallas again stated that she had a "personal" problem with Blanch. Kaylie also testified that Llampallas may have said something about a "personal" problem during their meeting, but that he "did not want to pry."

We find that these statements, standing alone, are not nearly enough to put Kaylie on notice that Blanch was sexually harassing Llampallas, especially in light of the fact that Kaylie claimed he never knew either Blanch or Llampallas was a lesbian. Even in this day and age, an employer is not expected to assume that two of his female employees have engaged in a sexual relationship. Llampallas' comment that she and Blanch had a "personal" problem, therefore, would not have put a reasonable employer on notice that Blanch and Llampallas were having a sexual relationship, let alone that Blanch was harassing Llampallas. The "personal" problem Llampallas referred to could have been any number of personal problems that did not involve discrimination against Llampallas based on her sex.

We also recognize that the district court found that several employees in the Hialeah facility had witnessed Blanch's harassment of Llampallas. Thus, an issue arises as to whether the harassment was so "severe and pervasive" that we could charge Mini-Circuits with constructive knowledge of Blanch's conduct. We believe, however, that Kaylie's meeting with Llampallas, at which he gave Llampallas an opportunity to provide him with actual knowledge concerning Blanch's motivations, negates any inference that Kaylie had mere constructive knowledge that Blanch was harassing Llampallas based on Llampallas' sex.

animus towards Llampallas and Kaylie's decision to discharge her on behalf of Mini-Circuits. Any contrary finding by the district court is clearly erroneous.

Llampallas still could have succeeded on her Title VII claim, of course, if she had presented evidence to support a claim that Kaylie himself harbored a discriminatory animus. She could then take advantage of the inference of causation arising from the fact that Kaylie also fired her.

Kaylie, however, did not sexually harass Llampallas, and Llampallas presented no evidence from which a trier of fact could infer that Kaylie himself harbored a discriminatory animus towards her or towards women in general. Thus, there existed no motivating animus to which Kaylie's termination of Llampallas' employment could be linked, and Llampallas' Title VII claim must fail because she failed to prove she was discriminated against "because of" her sex.

### III.

With respect to Llampallas, we VACATE the judgment of the district court in part and REVERSE in part, REMANDING this case for further proceedings consistent herewith. With respect to Cabrera, the District Court's judgment is AFFIRMED.

SO ORDERED.

27

EDMONDSON, Circuit Judge, concurs in the result.