MAY, C.J.
The Florida Department of Children and Families (DCF) appeals a judgment in favor of a terminated employee based on two claims of discrimination and one claim of retaliation. It argues the trial court erred in failing to direct a verdict in its favor because the plaintiff failed to prove a prima facie case to support each of the three claims. We agree and reverse.
The origin of the claims arose from the plaintiffs testimony in a 2001 grand jury proceeding. There, she testified that a coworker had been negligent in the supervision of an abused child under DCF supervision. The civil litigation arising from the grand jury testimony became known as the Amora case. Subsequent to her testimony, DCF provided the plaintiff with a $1,000 bonus, a scholarship to pursue a master’s degree, a special position, and several pay raises. The co-worker was terminated, but later reinstated and ultimately came to work under the plaintiffs supervision.
When the plaintiff was later terminated for breaking DCF policies, the plaintiff filed a complaint against DCF for violations of the Florida Civil Rights Act of 1992 (FCRA), sections 760.01-760.11 and 509.092, Florida Statutes (2007), and Florida’s Public Sector Whistle-blower’s Act (FPWA), sections 112.3187-112.31895, Florida Statutes (2007). She alleged that during the course of her employment, she was subjected to a hostile and abusive work environment due to her race and religion and DCF terminated her employment after she engaged in protected activity.[1] She alleged the co-worker, and now subordinate, bore hostility toward her, was rude, made racial and religious slurs, and ultimately reported her to the Inspector General (IG) for violation of DCF policies. The IG’s investigation resulted in the plaintiffs termination from DCF, a sanction more severe than that imposed on other employees who also broke DCF rules.
The case proceeded to a jury trial. The plaintiff testified that she began working for DCF in 1995 as a child protective services investigator. In 2001, DCF instructed her to provide a chronology of events to determine whether DCF followed proper procedures in the Amora case. This led to her grand jury testimony against the co-worker.
*302 In 2005, the plaintiff was promoted to the adult division where she became the supervisor of the reinstated co-worker against whom she had testified. When the plaintiff took over the co-worker’s supervision, the co-worker failed to report to work for thirty days. Upon the co-worker’s return, she was “nasty,” refused to talk to the plaintiff, and would “talk down” to her. The plaintiff alleged that the reinstated coworker accused her of not understanding “how people in the hood live” because the plaintiff is “white.” The co-worker told the plaintiff, “you’re White. You don’t get it. This is our culture.”
The plaintiff alleged that the co-worker made offensive religious comments. When the plaintiff brought her son to work, she commented on his hair and eye color, stating “[t]here is no way he is Jewish,” and that the boy “[didn’t] have a chance.” The co-worker wanted the plaintiffs son exposed to Jesus, and questioned if he would be kept in the plaintiffs “tribe.”
The plaintiff did not reprimand the coworker or downgrade her evaluations, but discussed the co-worker’s, behavior with her two succeeding supervisors. Despite almost daily discussions with her supervisors, the co-worker’s comments continued. Neither her first supervisor nor the succeeding supervisor recalled the complaints.
In May 2006, the co-worker filed a complaint with the IG, alleging the plaintiff violated DCF’s policies regarding Random Moment Sampling.[2] The co-worker alleged that the plaintiff instructed her staff to work on Medicaid cases during sampling to maximize federal reimbursements.
In June 2006, an anonymous report accused the plaintiff of abusing her child, being a Wiccan, and forcing her son to undergo unnecessary medical procedures. Circumstantial evidence linked the report to the co-worker. Although an investigation resulted in a finding of no abuse or neglect, five DCF employees, within the plaintiffs district, accessed the report. An IG investigation found the employees violated DCF policy and section 39.205, Florida Statutes (2006).
At the end of her case, the plaintiff read excerpts from a discovery deposition of the DCF district administrator into the record. The testimony focused on the administrator’s termination of the plaintiff based on the IG report and without an independent investigation or consideration of the plaintiffs “side of the story.” Other testimony reflected the administrator knew virtually nothing about the plaintiffs grand jury testimony or the Amora case with the exception of the resulting verdict.
When the plaintiff rested, DCF moved for directed verdict. It argued the plaintiff had failed to establish a prima facie case of discrimination, hostile work environment, or retaliation. The court denied the motion without prejudice. DCF renewed its motion for a directed verdict at the close of the plaintiffs rebuttal testimony. The trial court reserved ruling.
DCF called the district administrator as a witness. He testified that he knew nothing about the plaintiff until he saw the IG’s report regarding Random Moment Sampling. He confirmed his lack of knowledge of her race or religion and her involvement in the Amora case.
The IG’s report revealed that the plaintiff violated DCF’s policies. Specifically, the report found: (1) the plaintiff signed forms and distributed them to her employees in advance of the random sampling moments; and (2) the plaintiff directed her employees to prefer Medicaid cases over *303 other cases during sampling. The IG report named numerous witnesses, other than the plaintiff, who were interviewed during the investigation.
The district administrator terminated the plaintiff based solely on the IG report. He found her actions violated DCF rules governing management of employees and defied DCF’s mission and values. He did not speak with the plaintiff before terminating her. Instead, he sent a standard termination letter, which terminated her because she was a selected exempt service employee, who served at the pleasure of the agency head. The letter did not refer to her race, religion, or grand jury testimony.
The district administrator further explained the sanctions imposed on the five employees, who illegally accessed the child abuse report against the plaintiff. Three were African-American, one was white, and one was of East Indian descent. During the investigation, the East Indian employee resigned; two other employees were employed by a different district. The two remaining employees, one white and the other African-American, were allegedly given final notices of counseling, a step before dismissal. The white employee, however, testified that he was terminated. The three African-American employees remained employed with DCF.
Despite his deposition testimony, the district administrator admitted knowledge of the Amora case, the IG investigation of the employees who accessed the child abuse report against the plaintiff, and the co-worker having initiated the complaint to the IG against the plaintiff. Although neither the plaintiffs supervisor nor the IG recommended dismissal, he terminated the plaintiff. He found the employees that had illegally accessed the abuse report against the plaintiff did not warrant termination because no “malice” or “ill will” was found. He admitted however there was no evidence that the plaintiff had acted maliciously, and that he had never before terminated anyone based solely on an IG report.
The jury awarded the plaintiff $1,010,000 in total damages, finding DCF retaliated against her for the grand jury testimony, subjected the plaintiff to a hostile and offensive work environment, and discriminated against her because of her race and religion. DCF moved to set aside the jury’s verdict. The court denied the motion. DCF now appeals the judgment.
This Court reviews a trial court’s ruling on a motion for a directed verdict de novo. Meruelo v. The Mark Andrew of the Palm Beaches, Ltd., 12 So.3d 247, 250 (Fla. 4th DCA 2009). This Court “ ‘must view the evidence and all inferences of fact in a light most favorable to the nonmoving party-’” Id. (quoting Frenz Enters., Inc. v. Port Everglades, 746 So.2d 498, 502 (Fla. 4th DCA 1999)).
DCF argues the hostile work environment claim failed because the alleged conduct was not sufficiently severe or pervasive to alter the terms and conditions of employment. DCF next argues the discrimination claim fails because the plaintiff produced no evidence that she was terminated because of her race or religion. And last, DCF argues the whistleblower claim failed because there was no evidence the district administrator had knowledge of her grand jury testimony and there was a substantial amount of time between that testimony and the plaintiff’s termination.

Hostile Work Environment Claim

Harassment is actionable when it is “sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.” Mendoza v. Borden, *304 Inc., 195 F.3d 1238, 1245 (11th Cir.1999). An environment must be both objectively and subjectively offensive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). In determining whether harassment objectively altered an employee’s terms or conditions of employment, courts consider “the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” Id. at 23, 114 S.Ct. 367. “[Ojffhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the ‘terms and conditions of employment.’ ” Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).
Here, the co-worker’s racial and religious comments were not objectively severe or pervasive to alter the terms and conditions of the plaintiffs employment. The plaintiff testified that during one exchange between them, the co-worker made the following racial comment: “ ‘You don’t get it. You don’t know how people in the hood live. And this is acceptable behavior .... You’re White. You don’t get it. This is our culture....’” This single statement does not rise to the level of an actionable claim under FCRA.
As to the religious comments, the plaintiff testified:
There were a couple [of] different occasions where I needed to bring [my son] to work with me because of an appointment or no babysitter.... She would say, “Oh, this poor kid doesn’t have a chance, you know, being raised by a Jewish mother.” And you know, “Look at him. He is blond, blue-eyed. There [is] no way he is Jewish.” And, you know, “Are [you] going to raise him Jewish? He’s not Jewish. Look at him.” And I was like bewildered. And she would say, “Are you exposing him to Jesus?[ ] Are you going to keep him in your tribe?”
The plaintiff failed to establish that the comments were frequent. She testified to only one specific racial comment and one specific religious comment that she said occurred on a “couple different occasions.”
Although the comments were discriminatory and offensive to the plaintiff, they did not establish that the workplace was “permeated with ‘discriminatory intimidation, ridicule, and insult.’ ” Harris, 510 U.S. at 21, 114 S.Ct. 367 (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). This is particularly true given the comments were made by a subordinate whom the plaintiff supervised. Accordingly, the trial court erred in not granting DCF’s motion for a directed verdict on the plaintiffs hostile work environment claim. See Barrow v. Ga. Pac. Corp., 144 Fed.Appx. 54, 57-58 (11th Cir.2005) (holding employee failed to establish that alleged racial harassment, which included racial symbols of a rebel flag, “KICK”, and a noose, and racial slurs of being called “nigger,” “boy,” “black ass,” and “black boy” by various supervisors and superintendents, was sufficiently severe or pervasive to alter his working conditions); Alansari v. Tropic Star Seafood Inc., 388 Fed.Appx. 902, 904-05 (11th Cir.2010) (finding employee’s alleged religious harassment, “including solicitations to go to church because ‘Jesus would save’ him, comments about his Muslim religion, and the playing of Christian music ... may have been unwanted and even derogatory, but it did not rise to a threatening or humiliating level.”). Disparate Treatment Claim
DCF next argues the trial court erred in failing to direct a verdict or set *305 aside the verdict on the plaintiffs discrimination claim based on her race or religion. A plaintiff may establish a prima facie case of discrimination under Title VII on the basis of direct or circumstantial evidence. Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir.1997).
Derogatory comments can be direct evidence of discrimination if the comments were made by the decision maker responsible for the alleged discriminatory act in the context of the challenged decision. Wheatley v. Baptist Hosp. of Miami, Inc., 16 F.Supp.2d 1356, 1359-60 (S.D.Fla.1998), aff'd., 172 F.3d 882 (11th Cir.1999). Here, the plaintiff failed to show that the district administrator, the sole decision maker in this case, made any racial or religious comments. This leaves the plaintiff with the allegation of discriminatory discipline.
In discriminatory discipline cases, “the Plaintiff must prove that he is a member of a protected class and either a) that he did not violate the work rule, or b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar conduct.” Jones v. Winn-Dixie Stores, Inc., 75 F.Supp.2d 1357, 1364 (S.D.Fla.1999) (citing Jones v. Gerwens, 874 F.2d 1534, 1539-40 (11th Cir.1989)).
Employees are similarly situated when they are “involved in or accused of the same or similar conduct....” Holifield, 115 F.3d at 1562. Id. The most important factors “ ⅛ the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed.’ ” Jones, 874 F.2d at 1539-40 (quoting Moore v. City of Charlotte, 754 F.2d 1100, 1105 (4th Cir.1985)). “[T]he quantity and quality of the comparator’s misconduct [must] be nearly identical....” Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir.1999).
Here, the plaintiff introduced evidence that the district administrator terminated her based upon the findings in the IG report, while the district administrator did not terminate three African-American employees, who the IG also found violated DCF policy and criminal laws, for accessing a confidential child abuse report. During the IG investigation, those employees admitted to accessing the report purely for “personal” reasons.
Neither the comparable persons nor the comparable acts were similar. Illegally accessing child abuse reports is a less serious crime than Medicaid fraud. Further, the plaintiff was a supervisor, the other employees were subordinates. These are distinctions that justify the disparate imposition of sanctions. MacPherson v. Univ. of Montevallo, 922 F.2d 766 (11th Cir.1991); Winn-Dixie Stores, Inc., 75 F.Supp.2d 1357. The trial court should have either directed a verdict or set aside the verdict because the plaintiff failed to satisfy her prima facie case of discrimination.

Whistleblower Claim

DCF argues the trial court erred in denying the motion for a directed verdict regarding the plaintiffs whistleblower claim because the plaintiff failed to show a causal link between her grand jury testimony and her termination five and a half years later. We agree.
To establish a prima facie claim for retaliation under Florida’s Whistle-blower Act, sections 112.3187-112.31895, Florida Statutes (2007), a plaintiff must demonstrate: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there is a causal *306 relation between the two events. Rice-Lamar v. City of Fort Lauderdale, 853 So.2d 1125, 1132-33 (Fla. 4th DCA 2003) (quoting Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir.1998)).
To establish a causal connection, “ ‘a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated.’ ” Brungart v. BellSouth Telecomms, Inc., 231 F.3d 791, 799 (11th Cir.2000) (quoting Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir.1999)). Close temporal proximity between the protected activity and the adverse employment action can show that the two events were not wholly unrelated. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir.2007). If there is a substantial delay between the two events, the plaintiff must present other evidence tending to show causation. Id.
A plaintiff can also meet the burden of causation by providing sufficient evidence that the decision maker was aware of the protected conduct at the time of the adverse employment action. Brungart, 231 F.3d at 799-800. Alternatively, a plaintiff can establish causation under a “cat’s paw” theory when the harasser is not the decision maker. Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir.1998). Under the “cat’s paw” theory, the decision maker acts in accordance with the harasser’s decision when the decision maker fails to conduct an independent investigation, and instead rubber stamps the recommendations of the harasser. Id.
Here, the plaintiff failed to establish temporal proximity between the protected activity and her termination. She alleged that she was terminated in August 28, 2006 as retaliation for her grand jury testimony in January 2001. Between the grand jury testimony and her termination, DCF awarded her a $1,000 bonus, an academic scholarship, a position created for her, several pay increases, and a promotion.
Having failed to show a close temporal proximity between the two events, the plaintiff was required to provide other evidence showing causation, such as knowledge or the “cat’s paw.” Despite reading numerous portions of the district administrator’s testimony, the plaintiff never established he had knowledge of the Amora case. In fact, the deposition testimony read to the jury during the plaintiffs case established that he did not have any knowledge of the grand jury testimony, and only remembered hearing about a verdict in the Amora case. The plaintiff further failed to establish that the IG, who conducted the Random Sampling investigation, had any knowledge of her grand jury testimony.[3]
The plaintiff also failed to establish causation under a “cat’s paw” theory because an independent investigation was conducted by the IG. Although the investigation was prompted by the co-worker, the investigator interviewed twelve witnesses. The IG did not “rubber stamp” the allegations of the coworker. The IG found the plaintiff signed multiple forms in advance of sampling and distributed them to her employees in advance of the sampling moments. The district administrator testified that he terminated the plaintiff based on the IG report.
Nevertheless, the plaintiff argues the district administrator’s failure to investi *307 gate the matter himself, or conduct an interview of the plaintiff supports her claim. Sirpal v. Univ. of Miami, 684 F.Supp.2d 1349 (S.D.Fla.2010). Unlike Sirpal, here an independent investigation was conducted. The IG is by statute an independent investigative department. § 20.055(3)(b), Fla. Stat. (2007).
The plaintiff failed to establish her pri-ma facie case of causation. She failed to establish a close temporal proximity between the protected conduct and her termination; she failed to prove the district administrator’s knowledge of her protected conduct; or that he “rubber stamped” the co-worker’s allegations by failing to conduct an investigation. The lack of proof in this case warranted a directed verdict for DCF. The trial court erred in denying DCF’s motions. We therefore reverse and remand the case for entry of a judgment for DCF.

Reversed and Remanded.

DAMOORGIAN and CONNER, JJ., concur.

. The plaintiff brought retaliation claims under both FCRA and FPWA. However, the jury found in favor of DCF on the FCRA retaliation claim.

. Random Moment Sampling is a methodology used by DCF to conform to federal reporting requirements associated with Medicaid reimbursement to state agencies.

. The plaintiff argues that the district administrator did have knowledge of the Amora case because he was impeached several times during his cross-examination in which he admitted knowledge although he denied any knowledge in his deposition. While this is correct, his admission occurred after DCF’s motion for directed verdict.