**Wilbert HAMILTON, Plaintiff,**

v.

**MONTGOMERY COUNTY BD. OF EDUC., et al., Defendants.**

**No. Civ.A. 99–D–507–N.**

United States District Court, M.D. Alabama, Northern Division.

Oct. 19, 2000.

---

Artur Davis, Valerie Hicks Powe, Birmingham, Ala., for plaintiff.

"Spud" Seale, Martha Ann Miller, Hill, Hill, Carter, Franco, Cole & Black, Montgomery, Ala., for defendants.

## MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is Defendants' Motion For Summary Judgment ("Motion"), which was filed August 17, 2000. Plaintiff filed a Response on September 6, 2000, and Defendants filed a Reply on September 12, 2000. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendants' Motion is due to be granted in part and denied in part.

## I. JURISDICTION AND VENUE

The court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 1983 (Civil Rights Act of 1871). Neither party contests personal jurisdiction or venue.

## II. SUMMARY JUDGMENT STANDARD

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c).

At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). This determination involves applying substantive law to the substantive facts that have been developed. A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable law in relation to the evidence developed. *See id.* at 248, 106 S.Ct. 2505; *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir.1989).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the non-moving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). An action will be dismissed when the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *See id.* at 587, 106 S.Ct. 1348.

### III. FACTUAL BACKGROUND

This case involves two main issues. The first is whether racial discrimination or retaliation played a role in the non-selection of Plaintiff Wilbert Hamilton, a black male, for the position of head basketball coach at Jefferson Davis High School in June 1998. The second is whether Hamilton's filing of this present lawsuit has prevented him from obtaining myriad other coaching positions within the Montgomery County Public Schools since May 1999.

Wilbert Hamilton has more than twenty years of experience as an educator and coach. He was the varsity boys basketball coach at Jefferson Davis High School for fourteen years, winning more than 300 games and the only state championship in the school's history. But all the glitters is not gold. During the 1996–97 season, allegations arose that are not often heard at the high school level: namely, that Hamilton had violated state athletic rules by recruiting to Montgomery several players from the continent of Europe. Then-School Superintendent John A. Eberhart directed Jefferson Davis Principal Elizabeth Armistead to investigate these allegations.[1] In January 1997, following the investigation, Hamilton was placed on administrative leave. One of his assistant coaches, Lovell "Skipper" Jenkins, finished up the season. (Armistead's Dep. at 54; Eberhart's Dep. at 13; Hamilton Aff.)

In May 1997, Superintendent Eberhart recommended the non-renewal of Hamilton's contract, and the Board approved the recommendation by a split vote. Hamilton subsequently filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), as well as a lawsuit in October 1997. He remained with the district as a classroom teacher. (Hamilton Aff.)

That summer, school administrators gathered names of aspiring candidates to be Jefferson Davis's head varsity basketball coach for the 1997–98 season. The administration forwarded those names to Armistead. Eberhart directed her to chair an interview committee and recommend a new basketball coach, whose name would then be submitted to the Board of Education for its approval. Hamilton did not apply.

The committee looked seriously at the names of several applicants, including Terry Posey.[2] The committee eventually rejected all of the applicants. Posey, un-

---

1. Eberhart is not a party to this lawsuit.

2. Posey is a Montgomery native, who had a mediocre record as a high school coach in Pensacola, Fla. (Pl.Ex. 2 (Armistead)).

officially, was their third choice. (Armistead's Dep. at 60–64.) Disappointed with the applicant pool, the committee decided to keep Jenkins at the helm for another season. (*Id.* at 64–65; Mot. at 11.) At some point during the 1997–98 school year, Hamilton says, the athletic director at Jefferson Davis told him that he could maintain an active advisory role with the program, so long as he did not attend practices or sit on the bench during games. (Hamilton Aff.) Armistead, however, says that she instructed Hamilton and Jenkins that Hamilton's involvement with the program was limited strictly to answering specific questions posed to him by Jenkins. Other than that, he was "to have nothing to do with the program." (Armistead's Dep. at 92.) In the meantime, Hamilton dropped his original lawsuit. (Hamilton Aff.)

The position of head coach was posted again in May 1998, and Eberhart directed Hamilton to head up another interview committee. Hamilton applied, and the committee recommended his appointment. Eberhart placed Hamilton's name among the list of personnel candidates he recommended for approval by the Board of Education. The Board received the list prior to its scheduled monthly meeting, which was to be held June 11, 1998. (Eberhart Aff.)

A day or two before the meeting, Board member H.W. "Buddy" Brendle contacted Eberhart and voiced his objections to the recommendation. Brendle has a controversial history as a board member, and the record reflects tendencies of racism. (Lewis Aff; Wilson Aff; Brendle's Dep. at 5–73.) At the meeting on June 11, Eberhart asked the Board to withhold action on the Hamilton recommendation. The Board complied. (Eberhart's Dep. at 57.) Eberhart's deposition best reflects what led to his decision:

Q: Do you recall why no action was taken on Coach Hamilton?

A: Yeah. I think I asked the board to withhold action on that particular item.

Q: And why did you do that?

A: On a day right before the board meeting—and I can't tell you the exact day and time, but it was somewhere— the time was somewhere in the early afternoon. I received about two telephone calls in succession, just about. One call was from Mr. Brendle. And Mr. Brendle called and said, I see that you've recommended Coach Hamilton for the position and that y'all haven't interviewed everybody and you haven't given everybody a fair chance; you're just going ahead and putting Hamilton in that job like I thought you would. . . .

And I said, well, we followed the regular process. And he says, well, no, you haven't. And he said, I'm going to have somebody to [sic] call you because you haven't followed this process. And I said, fine, I'll be glad, you know, to talk to them. I said, we want to treat everybody fairly; we want to do the process right.

So that was the end of our conversation. And soon thereafter I did get a call from a person who sounded by his voice to be a little bit older than normal people who called in. And I do not recall that person's name, but my recollection is he introduced himself by name and he said that he had been the coach and physical ed director at Huntingdon College for a number of years and that one of his former players or students or some sort was very much interested in the job and that we wouldn't even interview him and that that person had used to work in the school system and that that was wrong and that we shouldn't do that. You know, he was kind of castigating me about that.

. . . . .

Q: And the second call you received, did that person reference Terry Posey by name? Did that person identify Terry Posey as the candidate for—

A: Yeah. I think he gave—and for me, that was the first time that I'd heard of

that name or the first time it had sunk in, you know, that—you know somebody may have showed me a list with ten names on it or something, but, you know, they were just—

Q: Was that the first conversation you recall having about Terry Posey?

A: Yeah, that there was somebody. Right. That was the beginning of my conversation. So I got a hold of Ms. Buskey [a school district administrator]. Find out, you know, Ms. Buskey, who applied, who came for the interviews. And she went over the list with me, and she had Terry Posey's name on the list. And I said, well, this person applied? Yes, he applied. Well, was he interviewed? And she said, no, that he wasn't. And I asked, why not? And the answer was that he was not able to come to the interview and that we did not kind of hear back from him or something.

And so I delved into that a little bit more: Why not? What was the problem? And as I understand the problem, was that he was down on the Gulf Coast, I think Pensacola, Florida. And in the summertime he was a part of a fishing boat job and that he went out on the fishing boats with whoever he goes fishing and that somebody—it could have been Ms. Buskey—or somebody from our personnel office had called and had left a message with his wife, I think, to get in touch with him and—again I don't remember the exact details—that if he was interested, he needed to get in touch and come up for the interview by Monday or something. I mean, it was a short time span. And that he did not come and so they had not interviewed him.

. . . . .

Q: Was there anything about that explanation that might have bothered you in any way?

A: Yes.

Q: Tell me about that.

A: I was concerned that no one in personnel had spoken directly to him where he said, yes, I can come for the interview or, no, I can't come.

Q: And you made a decision at that point not to submit Wilbert Hamilton's name to the board?

A: My decision was made at that point because I considered that the process was not complete.

(*Id.* at 57–62.)

The parties do not dispute that Eberhart alone made the decision to withdraw his initial recommendation of Hamilton, pending a new round of interviews. It is clear that the school district makes it a habit to interview each candidate for vacant positions. (Armistead's Dep. at 76.) At some point after Eberhart's decision to re-open the interview process, Armistead claims to have learned that Hamilton had obtained athletic shoes for the basketball team, in direct violation of her order to avoid entanglement with the program. (*Id.* at 124.) She questioned Hamilton about this incident and found his responses evasive. As a result, she claims that she lost confidence in him.[3] (*Id.* at 172–73.)

The second round of interviews continued, and Armistead's committee met with several candidates, including Hamilton and Posey. This time around, Posey was the top vote-getter, and Hamilton was near the bottom. (*Id.* at 174, 180.) The committee recommended Posey's appointment. Eberhart concurred and forwarded Posey's name to the Board of Education. It ratified the nomination at its next meeting.

Eberhart retired as school superintendent after the 1997–98 school year. He was succeeded by H. Clinton Carter some time around November 1998. (Carter Aff.) Hamilton filed this lawsuit in May 1999. In his original Complaint, his allegations solely revolved around his non-selection as varsity basketball coach in June

---

3. Eberhart subsequently deemed the rumors unfounded. (Eberhart's Dep. at 94.)

1998. (Am.Compl.¶¶ 7–28.) However, Plaintiff amended the complaint since its original filing. Now, in addition to raising claims about his non-selection as head basketball coach, he alleges that the school district has repeatedly retaliated against him ever since Carter became the district's educational leader. (2d Am.Compl.¶¶ 51–56.)

Specifically, Hamilton notes that he has sought more than twenty coaching positions within the Montgomery County school system and has been rejected each time. (Hamilton Aff.) During one interview, Lanier High School Athletic Director Ron Fuller questioned Hamilton about whether he had any lawsuit presently pending against the school district. (Fuller's Dep. at 40–47.) An affiant states that he heard Fuller say that Carter and an assistant superintendent told Fuller not to hire Hamilton because of this pending civil action. (Burkett Aff.) In addition, Armistead states that Carter once told her that he was pondering assigning Hamilton as a track coach at Lanier High School, perhaps in conjunction with settling this lawsuit. (Armistead's Dep. at 196–97.) Unfortunately for Hamilton, that appointment, too, never materialized.

Based on the foregoing, Hamilton brings suit against the Montgomery County Board of Education and Armistead, Brendle, and Carter in their official and individual capacities. Counts One, Two, and Three seek relief from the Board of Education, Brendle, and Armistead due to their alleged role in Hamilton's non-selection as head basketball coach in 1998. Counts One and Two allege race discrimination, in violation of the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Count Three alleges unlawful retaliation in response to Plaintiff's filing of a claim with the EEOC and in federal court in October 1997. Count Four alleges that Carter has retaliated against Hamilton since filing this instant lawsuit in May 1999.

## IV. DISCUSSION

### A. *Analytical Framework*

At the outset, the court *sua sponte* dismisses all of Plaintiff's claims against Defendants Armistead, Brendle, and Carter in their official capacities. *See Blalock v. Dale County Bd. of Educ.*, 84 F.Supp.2d 1291, 1314 (M.D.Ala.1999); *Blalock v. Dale County Bd. of Educ.*, 33 F.Supp.2d 995, 998 (M.D.Ala.1998). In addition, given that all Defendants are state actors, the court merges Plaintiff's § 1981 claim into his § 1983 claim, and dismisses Count Two against all of the individual Defendants. *See Pearson v. Macon–Bibb County Hosp. Auth.*, 952 F.2d 1274, 1278 n. 3 (11th Cir. 1992) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

With that housekeeping complete, the court turns to substantive employment law. Plaintiff may seek to prove discrimination by relying on either direct, circumstantial, or statistical evidence. *See Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir.1997). In this case, Plaintiff argues that he has produced direct evidence and circumstantial evidence for all three claims to survive summary judgment.

Direct evidence is that which, if believed, proves the existence of discriminatory motive "without inference or presumption." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.1998). Such evidence must truly be focused on the employment action at issue. As previously explained:

> Not only must it be evidence of discriminatory 'actions or statements of an employer' but the actions or statements at issue must 'correlat[e] to the discrimination or retaliation complained of by the employee.' Further, the statements 'must be made by a person involved in the challenged decision' and must not be subject to varying reasonable interpretations.

*Lane v. Ogden Entertainment, Inc.*, 13 F.Supp.2d 1261, 1274 (M.D.Ala.1998) (in-

ternal citations omitted). Under this standard, "[i]f an alleged statement at best merely suggests a discriminatory motive, then it is by definition only circumstantial evidence." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir.1999). However, if the nonmovant presents direct evidence that, "if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir.1997). Furthermore, when the matter does go to trial, the burden of proof shifts to the defendant to prove it is more likely than not that it would have made the same employment decision even if it had not used the proscribed criteria. *Lane*, 13 F.Supp.2d at 1274 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

Direct evidence is hard to find. In a more recent discussion of this issue, the Eleventh Circuit used the statement, "Fire Early—he is too old," in order to help analyze whether or not a given statement was directly correlated to the employment decision at issue. *Merritt*, 120 F.3d at 1190. The court held that the statement, "Your deposition was the most damning to Dillard's case, and you no longer have a place here at Dillard Paper Company," was direct evidence of an intent to retaliate against the Plaintiff for testifying in another employee's deposition. *See id.* On the other hand, a court applying the *Merritt* standard recently found that a supervisor's statement that "If you are late again, nigger, I'll fire your ass," was not direct evidence of race discrimination. *See Gullatte v. Westpoint Stevens, Inc.*, 100 F.Supp.2d 1315, 1318 (M.D.Ala.2000). Because one would have to infer that the employee subsequently was fired because of his race rather than his tardiness, the court found that the statement was circumstantial (though, no doubt, very persuasive) evidence. *See id.*

When a plaintiff relies on circumstantial evidence of discrimination, the familiar *McDonnell Douglas* burden-shifting analysis applies. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Koch v. Rugg*, 221 F.3d 1283, 1298 (11th Cir.2000) (Section 1983 claims). Under the *McDonnell Douglas* framework, a plaintiff must first raise an inference of discrimination by establishing a prima facie case. For discrimination claims, this means offering proof that the plaintiff: (1) is a member of a protected class; (2) was qualified for and applied for the promotion; (3) was rejected; and (4) other equally or less qualified employees who were not members of the protected class were hired. *See Anthony v. School Bd. of Hillsborough County*, 92 F.Supp.2d 1317, 1319 (M.D.Fla. 2000); *Passmore v. KinderCare Learning Ctrs., Inc.*, 979 F.Supp. 1413, 1417–18 (M.D.Ala.1997) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n. 11 (11th Cir.1997)). For retaliation claims, this means offering proof that the plaintiff: (1) engaged in statutorily protected activities; (2) suffered adverse employment action; and (3) some causal connection between the two events. *See Morgan v. Alabama*, 5 F.Supp.2d 1285, 1297 (M.D.Ala.1998). *See also Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331–32 (11th Cir.1999) (per curiam); *Llampallas v. Mini–Circuits, Lab, Inc.*, 163 F.3d 1236, 1247–49 (11th Cir.1998).

A prima facie case, along with any additional circumstantial evidence used to bolster the inferences raised from such a showing, causes the burden to shift to the defendant, who must "proffer a legitimate, non-discriminatory reason for the adverse employment action. The employer's burden is 'exceedingly light.'" *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1021 (11th Cir.1994) (citation omitted). The burden then shifts back to the plaintiff, who must show that the employer's proffered reasons are pretextual, or a cover for discrim-

ination. This is done by pointing to "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons ... that a reasonable factfinder could find them unworthy of credence." *Combs,* 106 F.3d at 1539 (citations omitted). The trier of fact may infer the ultimate fact of discrimination from the falsity of the employer's explanation. *See Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 120 S.Ct. 2097, 2108, 147 L.Ed.2d 105 (2000).

In other words, the prima facie case, plus sufficient grounds for disbelieving the defendant's proffered reasons, may "demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons." *Combs,* 106 F.3d at 1529. However, the ultimate burden of persuasion remains with the plaintiff at all times in cases involving merely circumstantial evidence.

### B. *Counts One and Three Against Brendle*

■ With those principles in mind, the court begins by considering Plaintiff's § 1983 claims against Mr. Brendle. *See* 42 U.S.C. § 1983. Essentially, Plaintiff seeks to hold Brendle responsible for Eberhart's decision not to recommend Plaintiff for the position of head basketball coach. For reasons the court cannot fathom, Brendle has stipulated for purposes of summary judgment that Hamilton can satisfy all three elements of the prima facie case. (Mot. at 18.) As explained in later detail, Plaintiff's claim involves a complex alleged chain of causation that will be quite difficult to establish. *See Stimpson,* 186 F.3d at 1331–32; *Llampallas,* 163 F.3d at 1247–51. Nevertheless, at this point, the court needs to make factual findings with respect only to whether Hamilton has produced sufficient evidence of discrimination or retaliation by Brendle. The court finds that Hamilton has satisfied his burden. Accordingly, summary judgment is due to be denied.

### 1. *No direct evidence of race discrimination*

Although this finding is not fatal to Hamilton's claim, the court rejects the argument that he has produced direct evidence that Brendle acted on the basis of race. Plaintiff finds direct evidence of Brendle's race-based discriminatory intent from extrinsic evidence and from various statements Brendle made during his deposition.

Brendle acknowledged that he has used the word "nigger" on numerous occasions in his life. (Brendle's Dep. at 37–39.) He stated that some blacks "don't deserve to be trusted." (*Id.*) Some blacks "are not people that you can count on in a lot of ways," he said, because they are out "getting drunk and staying out weeks and weeks at the time [sic] not trying to benefit their own lives or help their own selves [sic]." (*Id.*) Brendle also stated that, "as a whole population," he would agree with the suggestion that (in counsel's words) blacks "tend to complain a lot" and "tend to try to take advantage of the system sometimes." (*Id.* at 46.) When discussing the fact that the district's student body is more than half black, Brendle stated this is "bad" because "I do not feel like the white students should have to be going to private schools to get an education. We should make it to where they can get an education in our system." (*Id.* at 47.) The school system is worse off, he said, because it has "certain kind[s] of blacks." (*Id.* at 48.)

Plaintiff points to other evidence, such as the fact that Eberhart said that he felt at least some of Brendle's actions as a Board member appeared to be motivated by his racial attitudes. (Eberhart's Dep. at 72–73.) Plaintiff also obtained affidavits from one current and one former employee of Brendle's privately-owned business,[4] who stated that Brendle has used racial epithets on numerous occasions. (Wilson

---

4. Unlike officials in some other branches of local government, county school board members serve on a part-time basis and are not compensated for their services.

Aff.; Lewis Aff.) One affiant added that Brendle "charges black people and churches more money for the same items than he charges white people. He has also made the statement that black people and white people should not attend public school together." (Lewis Aff.)

While profoundly saddened and disappointed that a public official at this day and age would make such statements and engage in such activity, the court is constrained to find that Plaintiff has not produced direct evidence of racial discrimination. Some evidence is circumstantial because it is tangential to the decision at issue in this case. Other evidence is susceptible to competing interpretations. Finally, no evidence directly touches upon Brendle's alleged opposition to Plaintiff's employment as head basketball coach.

For example, while Brendle stated that he mistrusts some blacks, he believes that most school district employees of all races are "very intelligent individuals. I have a lot of respect for all of them." (Brendle's Dep. at 45.) While he "could have" made the statement that there are "good niggers and bad niggers," he draws the distinction based upon the person's behavior. (*Id.* at 45–46.) In any event, while Brendle has used the word "nigger" on various occasions, it is not part of his regular vocabulary. (*Id.* at 37.) He has never used racial epithets in reference to Hamilton, nor did he agree with the suggestion that (in the words of Plaintiff's counsel) the school district "doesn't need anymore nigger coaches." (*Id.* at 40.) Indeed, his opinion of Plaintiff was, perhaps, a positive one:

> I don't really have an opinion. I don't know that much about him. I can recall that he had a pretty dad-gum record as a basketball coach at Jeff Davis and I can recall these black coaches complain-

ing because he was also recruiting their boys. That's the only thing I can recall. (*Id.* at 66.)

Brendle denied believing that there are too many black teachers or black coaches in the Montgomery school system. (*Id.* at 48.) He stated that he would have no problem with blacks in positions of authority within the school district,[5] and he added that blacks may be better coaches than whites. (*Id.* at 42–43, 50.)

■ The court finds that Plaintiff's evidence does not necessarily lead to the conclusion that Brendle took race into account when he contacted Eberhart about the hiring process. The fact that a decisionmaker sometimes uses racial epithets, *see Gullatte,* 100 F.Supp.2d at 1318; *Greene v. City of Morrow,* 1997 WL 1883428 at *7 (N.D.Ga.1997) (per curiam); *Smith v. The Thresholds,* 1999 WL 410030 at *8–9 (.D.Ill.1999), or uses race to make private business decisions that are wholly unrelated to his official obligation to hire and fire school district employees, *cf. Carter,* 132 F.3d at 641–42; *Lane,* 13 F.Supp.2d at 1274, does not directly indicate that he is motivated by race when he acts as a public official. Nor does the fact that Brendle dislikes some blacks and attributes some characteristics to some black people directly indicate that he is motivated by race when he considers a personnel appointment involving a black candidate.

All in all, there is absolutely no direct evidence that Brendle acted on the basis of race when he contacted Eberhart with respect to this precise employment decision. While a jury could easily infer discriminatory intent, the inference would nevertheless have to be drawn. *See Carter,* 132 F.3d at 641–42; *Gullatte,* 100 F.Supp.2d at 1318. *Cf. Merritt,* 120 F.3d at 1190.

### 2. *Circumstantial evidence of race discrimination and retaliation*

That does not, however, mean that summary judgment is due to be granted.

---

5. Brendle also opined that Alan Keyes, a black Republican, might make an excellent President of the United States. (Brendle's Dep. at 42.)

Rather, the *McDonnell Douglas* burden-shifting analysis comes into play. Brendle's proffered legitimate non-discriminatory reason for asking Eberhart to interview Posey is that he had been contacted by Posey's father, who stated, first, that Posey was an outstanding high school basketball coach in Florida and, second, that Posey was a good person. (Mot. at 20–21; Reply at 3–4.) Brendle also argues that he interceded because he felt the process leading to Plaintiff's original selection was unfair, given that Posey had never been contacted for an interview. (*Id.*)

The court finds that a jury could conclude that these reasons were pretextual. Brendle had vague recollections that Posey was a decent Little League baseball player in the late 1960s. (Brendle's Dep. at 16.) Aside from that, Brendle's entire knowledge of Posey's professional and personal credentials was based on what he learned from Posey's father, who is a decidedly interested source. Before Posey's father contacted Brendle in June 1998, the two had virtually no contact in the previous 30 years. Indeed, Brendle could not remember having a single conversation with him in that time. (*Id.* at 16–18.) A jury could easily conclude that Brendle's actions had nothing to do with whether Posey was a better applicant than Hamilton.

Moreover, when Brendle contacted Eberhart about Plaintiff's impending selection, he commented that Eberhart was "just going ahead and putting Hamilton in that job like I thought you would." (Eberhart's Dep. at 58.) As Plaintiff notes, Brendle may have viewed Eberhart as an ally of black employees within the school system. Brendle may have been opposed to Eberhart's selection of a black candidate, rather than emphasizing his concern with maintaining a fair interview process. (*Id.* at 68.) Indeed, Brendle does not sug-

gest that he has interceded on behalf of other candidates in the past.

Thus, the court finds sufficient evidence for a jury to find that Brendle acted on the basis of Hamilton's race, rather than his proffered non-discriminatory reasons. If the jury rejects Brendle's explanation, it may properly infer discrimination. *See Reeves*, 120 S.Ct. at 2108; *Combs*, 106 F.3d at 1528.

The court also finds circumstantial evidence of retaliation. Brendle agreed that he does not like "lawsuits against the Board of Education." (Brendle's Dep. at 67.) A lawsuit, he said, sometimes is an attempt to take advantage of the system. (*Id.* at 67–68.) Because Hamilton had filed a prior EEOC complaint and federal lawsuit against the school district, a jury could find that Brendle was retaliating against Hamilton when he contacted Eberhart about Hamilton's pending appointment. Accordingly, Brendle's motion for summary judgment is due to be denied.

### 3. Likely lack of causation

■ The court repeats, however, that Hamilton will have grave difficulty establishing a prima facie case against Brendle at trial. Section 1983 creates a cause of action against any person who acts under the color of state law and deprives any citizen of his constitutional or statutory rights. *See* 42 U.S.C. § 1983. To prove intentional discrimination, Plaintiff must show: (1) the employer's discriminatory animus towards the employee based on the employee's protected characteristic; (2) a discharge or other significant change in the terms or conditions of employment; and (3) a causal link between the two. *See Stimpson*, 186 F.3d at 1331.

■ There is not much dispute over the first two elements. Eberhart's decision qualifies as an adverse employment action,[6] and there is circumstantial evidence

---

6. The Equal Protection Clause prohibits intentional discrimination on the basis of race, *see Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), or in retaliation for exercising one's constitutional rights in opposition to racial discrimination. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir.1986).

of discriminatory animus on Brendle's part. However, any causal connection between Brendle's animus and Hamilton's non-selection is almost certainly broken by Eberhart's independent investigation and subsequent decision to withdraw the nomination.

A review of Hamilton's version of events helps elucidate this point. His argument runs as follows: In June 1998, Jefferson Davis Principal Elizabeth Armistead and other school administrators, acting upon Superintendent Eberhart's request, interviewed candidates for the position of head basketball coach. After these interviews, an administrator verbally notified Hamilton that he had been recommended for the position. Eberhart agreed with the recommendation. He placed Hamilton's name, along with a list of numerous other personnel candidates he recommended for assignment and employment, in the informational packet provided to all Board of Education members prior to their monthly meeting.

However, Brendle contacted Eberhart a day or two before the scheduled meeting and expressed concerns that Posey had not been interviewed for the job. In response, Eberhart withdrew his recommendation of Hamilton and directed Armistead to re-open the interview process. At the end of this new round of interviews, Armistead and her committee recommended Posey—not Hamilton—for the position. Eberhart adopted the recommendation, forwarded it to the Board of Education, and it concurred. But for Brendle's race-based or retaliatory actions, Hamilton argues, the original recommendation would have gone forth, and Hamilton's name would have been approved by the Board of Education instead of Posey's. Thus, Brendle (and, taking it one step further, the Board) deprived him of his constitutional rights.

So goes Plaintiff's claim. It will be exceedingly difficult to prove. In fact, the Eleventh Circuit recently dismissed a claim that is substantially similar to this one. *See Stimpson*, 186 F.3d at 1329–31.

In *Stimpson*, the police chief and city council recommended the termination of the plaintiff, who was a city police officer. *See id.* at 1330. The city had no statutory power to dismiss the officer; that power was vested in a civil service board alone. The board had the discretion to terminate, impose lesser sanctions, or completely vindicate an officer brought before it. *See id.* at 1331. As a result, the court explained, "the City's recommendation that the Board terminate Stimpson does not, itself, constitute a change in the terms or conditions of employment absent a sufficient causal link between the termination and the discriminatory animus behind the recommendation." *Id.*

The court went on to note that "a discharge recommendation by a party with no power to actually discharge the employee may be actionable if the plaintiff proves that the recommendation directly resulted in the employee's discharge." *Id.* (citing *Zaklama v. Mt. Sinai Med. Center*, 842 F.2d 291, 294 (11th Cir.1988)). However, the court added, "this causation must be truly direct." *Id.* It stated that

[w]hen the biased recommender and the actual decisionmaker are not the same person or persons, a plaintiff may not benefit from the inference of causation that would arise from their common identity. Instead, the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee.

*Id.* (citing *Llampallas*, 163 F.3d at 1248). The court then found that Stimpson had not "introduced any evidence that could reasonably indicate that the City's alleged discriminatory animus influenced the Board's decision to terminate her." *Id.* at 1332. Because the Board terminated Stimpson because of her misconduct, the Eleventh Circuit dismissed her claim against the City.

This case appears to differ from *Stimpson* in no material way. The personnel decision at issue in Counts One and Three is Eberhart's withdrawal of his earlier nomination of Hamilton.

■ Under Alabama law, an individual school board member has no decisionmaking authority. That power is vested in the county board of education, which acts as a group decisionmaking body. *See* ALA.CODE § 16–9–23 (1975) (appointments are made by "the county board of education"); *see also* Christopher R. McFadden, Comment, *Integrity, Accountability, and Efficiency: Using Disclosure to Fight the Appearance of Nepotism in School Board Contracting*, 94 NW.U.L.REV. 657, 677 (2000) ("Individual school board members have no power to execute employment or service contracts. These decisions can be made only by majority vote of the board during a public meeting.")

■ Moreover, under Alabama law, the superintendent has the exclusive power to nominate for appointment all "regular employees of the board." ALA.CODE § 16–9–23 (1975). He also has the exclusive power to *"assign them to their positions,* transfer them as the needs of the schools require, recommend them for promotion, suspend them for cause and recommend them for dismissal." *Id.* (emphasis supplied).

The Code, therefore, mandates a two-step employment process, with a division of functions between the superintendent and the board of education. The superintendent is exclusively responsible for making personnel recommendations, and the board of education is exclusively responsible for acting upon those recommendations. Neither entity can make a personnel decision without the approval of the other. *See Guyse v. Morgan County Bd. of Educ.,* 516 So.2d 692, 693 (Ala.Civ.App. 1987) ("reemployment requires a two-step process of a recommendation by the superintendent and approval by the Board"); *Board of Educ. of Escambia County v. Watts,* 19 Ala.App. 7, 95 So. 498, 500 (1922)

("the county board has no power to act until a principal has been recommended in writing by the superintendent of education"); *see also Jones v. Alabama St. Tenure Comm'n,* 408 So.2d 145, 148 (Ala. Civ.App.1981) ("The authority to recommend dismissal to the Board of Education rests with the superintendent, not the Central Appeals Committee."); McFadden, *supra* at 677 ("Because school boards can employ only those teachers that the superintendent recommends, they have very little discretion in hiring teachers. In most cases, their discretion is limited to rejecting recommendations after the superintendent has made them.")

In other words, Superintendent Eberhart is the "decisionmaker" who recommends employment. The Montgomery County Board of Education is the "decisionmaker" that either accepts or rejects that recommendation. *See* ALA.CODE §§ 16–8–23, 16–9–23 (1975). The appointment power is joint in the sense that the board cannot authorize any personnel action without the superintendent's prior recommendation, *see Mencer v. Hammonds,* 134 F.3d 1066, 1068 n. 4 (11th Cir.1998) (applying Alabama law), but there is no question that the superintendent alone has the power to make the recommendation in the first instance.

Thus, just as the power of termination in *Stimpson,* 186 F.3d at 1331, rested with the civil service board, the power of recommendation in this case rests with the superintendent. Just as the city council in *Stimpson* could not terminate a police officer, Brendle cannot recommend employment of a coaching candidate. It follows, then, that just as Stimpson could not prove causation without showing evidence of discrimination on the part of the civil service board, Hamilton cannot show causation without evidence of discrimination via Superintendent Eberhart. In other words, Hamilton can prevail only by showing that the discriminatory animus behind Brendle's actions—and not his assertion that the interview process should be re-opened

**1286**

because it was unfair—"was an actual cause of [Eberhart's] decision" not to recommend Hamilton. *See id.*

The court cannot see how Plaintiff will make this showing. It is undisputed that Eberhart was not motivated by race or retaliation.[7] The evidence suggests that the school district normally interviews all applicants for vacant positions. Eberhart decided to withdraw Hamilton's recommendation and re-open the process because he felt it was not complete—Posey was an interested candidate, and he had not been interviewed. Eberhart came to this decision after conducting his own independent investigation concerning the original interview process. At this point, there is no allegation that his investigation was less than thorough. *See Llampallas,* 163 F.3d at 1251 (no causal connection if decisionmaker was not biased, undertook independent evaluation, and agreed with the merits of discharge recommendation by biased supervisory employee). *Cf. Kramer v. Logan County Sch. Dist. No. R–1,* 157 F.3d 620, 624–25 (8th Cir.1998) (causal connection is question of fact if discriminatory discharge recommendation by nondecisionmaker is not adequately investigated by decisionmaker).

To be sure, Eberhart probably would not have re-opened the interview process if Brendle had not contacted him. He would not have known that Posey was not extended an interview. Without that telephone call, the recommendation probably would have gone to the entire Board of Education, which arguably would have approved it. But this causal connection is not sufficiently direct to sustain Hamilton's claims against Brendle or the Board of Education. In *Stimpson,* 186 F.3d at 1329–31, the civil service board would not have had the opportunity to consider approving Stimpson's termination if the city had not brought her up on charges. Nevertheless, the Eleventh Circuit held that

this fact did not link the board's ultimate employment decision to the city's alleged discriminatory animus. Without causation, there was no claim. *See id.* at 1331–32.

Given the nature of Defendants' Motion, Plaintiff was not asked to point to evidence that Brendle's alleged animus, rather than his statements about the demerits of the interview process, proximately caused Eberhart to withdraw the recommendation. Likewise, Plaintiff was not required to show evidence supporting the dubious proposition that Eberhart rubber stamped Brendle's personnel recommendations. Without the production of such evidence at trial, however, there can be no claim against Brendle. *See id.*

### C. *Counts One and Three Against Armistead*

Defendant Armistead's motion for summary judgment also is due to be denied. While the court notes that Plaintiff may have difficulty satisfying the element of causation, the court finds sufficient evidence for a rational jury to find in favor of Plaintiff.

The principles articulated in Part IV.B. guide the court's analysis of Plaintiff's § 1983 claim against Ms. Armistead, who headed the committee that interviewed candidates for the head basketball coaching position at Jefferson Davis High School. Plaintiff's claim against Armistead focuses on her committee's decision to recommend Posey for the head coaching position, rather than Hamilton. As explained previously, the committee originally recommended Hamilton, then switched its support to Posey after Eberhart ordered a new round of interviews.

The court finds that an interview committee's decision not to recommend a particular candidate could qualify as an adverse employment decision. Thus, the burden shifts to Armistead to offer a legitimate non-discriminatory and non-retaliato-

---

7. Hamilton dismissed all of his claims against Eberhart, stating that "the discovery and investigation in this case have produced no

evidence that [D]efendant Eberhart intentionally violated any rights of the plaintiff." Mot. To Dismiss Def. Eberhart (Sept. 5, 2000).

ry reason for her employment decision. She states that she supported Hamilton in the first round of interviews but changed her vote because she heard that Hamilton may have arranged for the purchase of shoes for basketball team members, thereby defying her order to avoid entanglement with the program. (Mot. at 21.) Moreover, she notes that she had only one vote; the committee rejected Hamilton by more than a one-vote margin. (*Id.*)

Because Armistead has articulated a legitimate reason for her decision, the burden shifts back to Hamilton to show that these reasons are actually a pretextual cover for unlawful behavior. The court finds that Hamilton has pointed out several possible weaknesses with that response.

First, Armistead's opposition to Hamilton's appointment may have significantly pre-dated her discovery about the basketball shoes. (Armistead's Dep. at 25, 63.) Second, there is conflicting evidence over whether or not Hamilton was given strict instructions to avoid involvement with the program. (Hamilton's Dep. at 80.) Third, Armistead's review of the shoe-buying charges might be considered merely cursory, thus casting doubt on her proffered reason. (Armistead's Dep. at 141–45.) Finally, her explanation that the committee's support for Hamilton collapsed due to the charges might be considered incredible, given that the rumors were not yet confirmed. Indeed, aside from Armistead's testimony, there is a lack of evidence as to what went on during the committee's deliberations, which were conducted behind closed doors.

A jury might be persuaded by Armistead's proffered explanations. On the other hand, if a jury rejects her testimony, it may rationally conclude that her reasons are merely pretextual. From that conclusion, a jury may properly infer discrimination. *See Reeves,* 120 S.Ct. at 2108. However, consistent with the principles of "cat's paw" liability, Hamilton's claim against Armistead will fail if he cannot adduce evidence at trial linking Armi-

stead's alleged discriminatory or retaliatory animus to Eberhart's eventual decision to approve Posey's recommendation.

■ A supervisory employee may be held liable for decisions ultimately rendered by her superior, if the plaintiff shows that the intermediary used the decisionmaker as a "cat's paw." *Cf. Llampallas,* 163 F.3d at 1249 (citing *Long v. Eastfield College,* 88 F.3d 300, 307 (5th Cir. 1996)). Put another way, "causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating" the intermediate employee's actions. *Stimpson,* 186 F.3d at 1332. The intermediary effectively becomes the decisionmaker, and the "titular 'decisionmaker' is a mere conduit for the [employee's] discriminatory actions." *Llampallas,* 163 F.3d at 1249; *see also Kramer,* 157 F.3d at 624 (discussing agency principles).

As noted above, the ultimate power of recommendation rests with the superintendent of schools. Although Armistead's personnel recommendations are persuasive, they are ultimately forwarded to the superintendent for final approval. Thus, Armistead does not have "the final 'say so' regarding any of the alleged discriminatory acts affecting Plaintiff's terms and conditions of employment." *Blalock,* 84 F.Supp.2d at 1313.

At this point, there is not enough evidence for the court to conclude whether Eberhart approved Armistead's subsequent recommendation of Posey after a mere cursory review. As such, it becomes a jury question whether Eberhart was a conduit for Armistead's alleged discriminatory actions. If the jury concludes that Armistead acted out of impermissible bias, and that Eberhart approved Armistead's recommendation without giving adequate independent consideration as to whether Posey was truly a better candidate, then the jury could find a sufficient connection between Armistead's impermissible behavior and Hamilton's ultimate adverse em-

ployment action. The court will allocate the respective burdens after reviewing the evidence presented at trial. *See Fuller v. Phipps*, 67 F.3d 1137, 1142–43 (4th Cir. 1995).

Without these requisite findings, however, there can be no liability, for any causal chain between Armistead's animus and Hamilton's non-selection would have been broken by Eberhart's independent, non-biased decision about the merits of the recommendation. Accordingly, because material factual disputes exist at this point, summary judgment is due to be denied with respect to Defendant Armistead on Counts One and Three.

### D. *Count Four Against Carter*

■ Count Four also will survive summary judgment. The court finds that Plaintiff has satisfied its burden of producing evidence that Defendant Carter retaliated against Hamilton for filing this instant lawsuit in May 1999. Carter replaced Eberhart as superintendent of schools in November 1998, and the record contains both direct and circumstantial evidence that he may have engaged in retaliatory conduct since that time.

Initially, the court finds direct evidence of retaliation. Plaintiff has produced an affidavit from an individual stating that he was present during a conversation in which Ron Fuller, athletic director at Lanier High School, stated that he had intended to hire Hamilton as a track coach. Fuller said that he did not appoint Hamilton, however, because he had been instructed by Carter and an assistant superintendent that "Hamilton should not be hired because of his pending litigation." (Burkett Aff.)

This is the equivalent of a smoking gun. No real inference is necessary to conclude that it is an unambiguous command to make the complained of employment decisions based on a forbidden criteria. *See Merritt*, 120 F.3d at 1190. While the statement is double hearsay, it most likely fits into the exceptions carved out for par-

ty-opponent admissions and statements by agents. *See* FED.R.EVID. 801. Its voracity has not been challenged. Thus, it may be appropriately credited at the summary judgment stage. *Cf. Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 962 (11th Cir.1997) (inadmissable hearsay does not qualify as direct evidence).

If this evidence does not materialize for some reason, and Plaintiff must rely on circumstantial evidence, the court still finds that Plaintiff has satisfied his burden of production. Carter's proffered response is that he never retaliated against Hamilton because he never received a recommendation from an athletic director or principal recommending that Hamilton be employed. Without such a recommendation, Carter states, he could not make an employment decision one way or another. (Carter Aff.)

Carter's proffered non-discriminatory reason shifts the burden of production back to Hamilton. The court finds that he has cast sufficient doubt upon Carter's statements to avoid summary judgment. As Plaintiff observes, Carter told Armistead that he was considering assigning Hamilton to the position of track coach at Lanier High School, perhaps "as part of some sort of settlement." (Armistead's Dep. at 196–97.) It goes without saying that one's employment cannot be conditioned upon such an agreement. Though Carter's statement may be subject to competing inferences, a jury may properly conclude that he acted with retaliatory animus when he made recommendations to the Board of Education about vacant coaching positions.

Thus, it is a question of fact whether Carter ordered his subordinates to engage in retaliatory behavior, and whether Carter harbored retaliatory animus when he filled vacant positions with candidates other than Plaintiff. If Hamilton applied for a position, and Carter acted upon a forbidden criteria when filling that position, then each decision directly deprived Hamilton of his constitutional rights. This is true

because, even if the athletic directors selected someone who they felt was objectively better qualified than Hamilton, Carter was ultimately approving the decisions for an impermissible reason—namely, that the candidate recommended was not someone who had filed a lawsuit against the school district. *See Llampallas,* 163 F.3d at 1251. Accordingly, summary judgment is due to be denied on Count Four.

### E. *Qualified Immunity and the Board's Derivative Liability*

 Armistead, Brendle, and Carter concede that they are not entitled to qualified immunity in their individual capacities. (Mot. at 23–25.) All three Defendants were acting within the scope of their discretionary authority, and they acknowledge that is a violation of clearly established law to discriminate on the basis of race in public employment or to retaliate against a plaintiff for exercising his constitutional rights. *See Courson v. McMillian,* 939 F.2d 1479, 1486 (11th Cir.1991) (enunciating two-pronged test for evaluating claims of qualified immunity); *see also Washington,* 426 U.S. at 239–41, 96 S.Ct. 2040 (clearly establishing right to freedom from racial discrimination in public employment); *Donnellon,* 794 F.2d at 600 (same for freedom from retaliation). However, the court finds that the Montgomery County Board of Education can be held liable only for Carter's alleged misconduct—not Armistead's.[8]

Because there is no respondeat superior liability under § 1983, liability can attach to the Board only if the alleged discrimination or retaliation by its employees was caused by an "official policy" or "custom" of the Board. *See Monell v. Dep't of Social Serv.,* 436 U.S. 658, 690–92, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiff can demonstrate an official policy or custom by showing that his adverse employment decision resulted from either: (1) a policy statement, ordinance, regulation or deci-

sion officially adopted and promulgated by board members; (2) a custom that, while not formally adopted, was so permanent and well settled as to have the force of law, *see id.* at 690–91, 98 S.Ct. 2018; or (3) a decision by an official who possesses "final authority to establish municipal policy with respect to the action ordered." *Brown,* 923 F.2d at 1480.

Superintendent Carter could be held liable under either of two theories. First, the court finds that he is a final decision-maker with respect to personnel appointments. Alabama law clearly provides that no potential employee can obtain full school board approval without his recommendation. *See* ALA.CODE §§ 16–8–23, 16–9–23 (1975). Therefore, his recommendations are essentially those of the governmental body. *See Mencer,* 134 F.3d at 1068.

Second, the court finds sufficient evidence for a rational jury to conclude that, after Carter's appointment as superintendent, the school district employed a well-settled custom of retaliating against employees who have opposed or participated in the opposition to racial discrimination. Hamilton has alleged that he applied for at least twenty coaching positions since filing this instant lawsuit. Yet, despite having more than twenty-five years of coaching experience within the district, he has not been recommended for employment once. (Hamilton Aff.) There is direct evidence, in fact, that such decisions were made pursuant to Carter's directives.

Defendants have stipulated for purposes of this Motion that Hamilton has raised a prima facie case of retaliation. (Mot. at 18.) Therefore, the court finds that Hamilton's own experiences are sufficient to suggest a pattern and practice of retaliatory behavior. *See Brown,* 923 F.2d at 1481 (allegation of series of discriminatory practices involving plaintiff and known by su-

---

**8.** The parties have not fully briefed the issue of whether liability can attach to the Board of Education due to the actions of one of its

members in his individual capacity. The court, therefore, reserves judgment on this issue.

pervisor sufficiently states a claim based on municipal custom). As a result, the Board of Education can be held liable for such retaliation.

However, the court finds no grounds for holding the Board liable for Armistead's alleged misconduct. Although her personnel recommendations are persuasive, they are forwarded to other higher-ranking school administrators or, ultimately, the superintendent for final approval. Therefore, even if the superintendent is her cat's paw, she is not the decisionmaker under Alabama law. *See Blalock*, 84 F.Supp.2d at 1313 (finding, under similar facts, that athletic director is not ultimate decisionmaker). Moreover, Plaintiff's evidence of a pattern and practice of retaliation does not antedate Carter's appointment as superintendent. One alleged adverse employment decision made prior to that point does not establish a custom. *See Hughes v. Halifax County Sch. Bd.*, 855 F.2d 183, 186 (4th Cir.1988).

## V. ORDER

Accordingly, it is CONSIDERED and ORDERED that Defendants' Motion For Summary Judgment be and the same is hereby GRANTED in part and DENIED in part as follows:

(1) The Motion be and the same is hereby GRANTED for all of Plaintiff's claims in Counts One, Two, and Three against Armistead, Brendle, and Carter in their official capacities;

(2) The Motion be and the same is hereby GRANTED as to Count Two against all Defendants;

(3) The Motion be and the same is hereby DENIED as to Counts One and Three against the Montgomery County Board of Education in all respects, and DENIED against Armistead and Brendle in their individual capacities;

(4) The Motion be and the same is hereby DENIED for Count Four against Carter in his individual capacity;

(5) The Montgomery County Board of Education may be held liable for the actions of Carter but not for the actions of Armistead in their individual capacities.