[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10451
Non-Argument Calendar

_____

D.C. Docket No. 2:18-cv-00172-PAM-UAM

THOMAS BLIGH,

Plaintiff-Appellant,

versus

COLLIER COUNTY, DISTRICT SCHOOL BOARD,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 22, 2020)

Before WILLIAM PRYOR, Chief Judge, BRANCH and GRANT, Circuit Judges.

PER CURIAM:

This appeal arises from Thomas Bligh's age discrimination suit against his former employer, the District School Board of Collier County, Florida. After the Board failed to renew his annual contract, Bligh sued under the federal Age Discrimination in Employment Act and the Florida Civil Rights Act. *See* 29 U.S.C. § 623(a)(1); Fla. Stat. § 760.10(1)(a). The Board says that they terminated Bligh because of poor performance, not his age. The district court granted summary judgment in favor of the Board and, after de novo review, we affirm.

\* \* \*

We analyze Bligh's claims under *McDonnell Douglas*'s burden-shifting framework. *See Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (applying the framework to an ADEA claim); *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1266 (11th Cir. 2014) (applying the framework to an FCRA age discrimination claim). Here, neither party disputes that Bligh established a *prima facie* case of age discrimination or that the Board articulated a nondiscriminatory reason for not renewing his contract. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (identifying first two steps of the framework). The issue on appeal is whether Bligh presented evidence that would allow a reasonable factfinder to determine that the Board's proffered reason was pretextual—that is, that "the reasons given by the employer were not the real

2

reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).

In trying to demonstrate pretext, a plaintiff cannot merely "recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). We do not "sit as a super-personnel department that reexamines an entity's business decisions." *Alphin v. Sears, Roebuck & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991) (citation omitted). If the proffered reason is one that might motivate a reasonable employer, then the plaintiff "must meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. And when an employee is fired for poor performance, the "inquiry into pretext centers on the employer's beliefs, not the employee's beliefs." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

Bligh argues that summary judgment was improper because evidence showed that the Board's proffered reason for not renewing his employment contract—poor performance—was a pretext for age discrimination. Even viewing the record in the light most favorable to Bligh, we find no evidence that the Board's proffered nondiscriminatory reason was merely a pretext for age discrimination. The facts surrounding Bligh's appeal are well-known to the parties

3

and are recounted in detail by the district court, so we mention only those aspects of the record that are most important to our conclusion.

The District School Board employed Bligh for roughly 25 years, until the end of the school year in 2015. From 2000 onward, he served as the Assistant Principal for Attendance and Discipline (APD) at Gulf Coast High School. From 2005 through 2015, Bligh worked under three principals: David Stump, Kenneth Fairbanks, and Joseph Mikulski.

All three principals raised concerns about Bligh's performance. Stump testified that Bligh was sometimes absent during incidents on campus. "We'd radio, radio, radio, wouldn't find him." Bligh's absence would force Stump to administer the disciplinary process himself, including filling out paperwork and meeting with parents.

When Fairbanks took over, several of Bligh's coworkers told him that Bligh was often unavailable when a disciplinary or attendance issue arose. After several months of observation, Fairbanks concluded that Bligh's secretary ran the office: handling disciplinary referrals, contacting students, and contacting parents. According to Fairbanks, Bligh's secretary expressed frustration about having to handle Bligh's work. Overall, Fairbanks's impression was that Bligh avoided dealing with "difficult" issues, such as fights, drugs, alcohol, and students swearing at teachers. He claims to have repeatedly counseled Bligh that his performance

4

was lacking and that he risked losing his job without improvement. On April 18, 2012, Fairbanks sent Bligh a letter memorializing a conversation with Bligh about his performance. He wrote that Bligh's performance "negatively impacts the school since others have had to assume your responsibilities." Further, an Assistant Principle with Bligh's experience "should be able to perform at a higher level of proficiency than has been demonstrated in the past."

Things did not improve when Mikulski took over. Mikulski estimates that he spoke with Bligh roughly ten times about his performance. Specifically, Mikulski believed that Bligh was too lenient with students and failed to consistently follow the district's "discipline matrix," which provided specific penalties for various student conduct violations. Mikulski even began to suspect that Bligh was deleting some discipline referrals rather than processing them. Like Fairbanks before him, Mikulski shared his concerns with the district superintendent, Kamela Patton.

Between February 2014 and March 2015, Bligh met with Patton and her staff on three occasions. Each time, she warned him that his position was in jeopardy. Toward the end of the 2014 – 2015 school year, Mikulski informed Bligh that that he would not remain APD.

Bligh denies that his performance was deficient. He points to numerous annual performance evaluations that rated him "effective." These evaluations,

5

Bligh says, would give a reasonable jury cause to doubt the Board's official story. But Bligh's evaluations are only relevant insofar as they bear on the mindset of any decisionmaker. While the annual evaluations may be evidence that Bligh had redeeming qualities, they do not cast doubt on the specific performance issues identified in, for instance, Fairbanks's 2012 letter to Bligh or Bligh's three meetings with Patton. And as Patton stated in her deposition, "sitting in front of me should also send a grave concern to any employee, let alone three times."

Given other evidence of performance issues, at least from the Board's perspective, Bligh's annual evaluations do not create a triable issue over whether Bligh was fired because of his age. This is especially true because of undisputed record evidence that the state's methodology for annual evaluations emphasized instruction metrics rather than discipline and attendance metrics that were perhaps more relevant to Bligh's job duties.

Bligh also says that the Board's claims of poor performance are contradicted by the testimony of two subordinates. He says that their testimony shows—contrary to the Board's assertions—that he was a visible presence on campus, appropriately followed-up on disciplinary referrals, did not over delegate, and was not too friendly with students. We note, though, that although both employees had some nice things to say about their former boss, Bligh's former secretary confirmed that she approached Fairbanks because she was frustrated and believed

6

that the office could benefit from additional guidance.  In any event, none of this disproves the Board's claim of poor performance so much as it provides a different perspective.  But it is Patton's and Mikulski's perspectives that count, not those of Bligh's subordinates.

Finally, Bligh makes two additional challenges, which we will address briefly.  *First*, he says that he has shown a "convincing mosaic" of circumstantial evidence that would allow a jury to infer discriminatory intent.  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  Bligh points to the facts that he was replaced by a younger APD, and that he was denied the opportunity— offered to another assistant principle—to transfer to a different school in the district.  These "tiles" do not form a convincing mosaic.  An otherwise lawful termination does not become suspect simply because the Board hired a younger replacement, nor because the Board did not shuffle someone it saw as a poor performer to another school.

*Second*, Bligh tries to prevail under a "cat's paw" theory.  His reliance on this theory is misplaced.  In a cat's paw situation, "the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers."  *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).  But Bligh has shown no evidence of discriminatory

7

intent by *any* employee in the school district, much less by someone in a position to influence his employment.

**AFFIRMED.**